1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LIGHTHOUSE RESOURCES INC.; LIGHTHOUSE PRODUCTS, LLC; LHR INFRASTRUCTURE, LLC; LHR COAL, LLC; and MILLENNIUM BULK TERMINALS-LONGVIEW, LLC, | NO. |
| | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| vs. | |
| JAY INSLEE, in his official capacity as Governor of the State of Washington; MAIA BELLON, in her official capacity as Director of the Washington Department of Ecology; and HILARY S. FRANZ, in her official capacity as Commissioner of Public Lands, | |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 1 OF 53
(                              )
[4822-5378-3084]

## I.     INTRODUCTION

1.     From the framing of the Constitution, the federal government has enjoyed supreme authority to regulate foreign and interstate commerce.

2.     In giving the federal government this authority, the Constitution necessarily prohibits individual states from discriminating against, or unreasonably burdening the free flow of, such commerce.

3.     Plaintiff Lighthouse Resources Inc. and its subsidiaries are filing this action because the Defendants are actively preventing coal mined in other states from moving in foreign and interstate commerce.

4.     In particular, the Defendants have unreasonably delayed and denied a number of permits and approvals for a port facility that would enable the export of coal to U.S. allies and trading partners in Asia.

5.     Those Asian trading partners want the United States to help them meet their coal demands. They have specifically identified coal from the Powder River Basin in Wyoming and Montana as having ideal characteristics, including for the next generation of high efficiency, low emissions coal-fired power plants.

6.     The United States, which possesses the largest coal reserves in the world, wants to supply coal to its Asian allies, and is aggressively pursuing a national policy that facilitates coal exports to Asia.

7.     Lighthouse Resources Inc. (Lighthouse) and its subsidiaries are working to meet Asian coal demand. They have already contracted for delivery of coal to customers in Asia. But Lighthouse cannot address Asian demand or fulfill its contracts

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 2 OF 53
(                                )
[4822-5378-3084]

with Asian customers unless additional economic coal export capacity opens on the West Coast.

8.    To address this capacity deficit, one of Lighthouse's subsidiaries is proposing a new coal export facility at the existing Millennium Bulk Terminal in Longview, Washington. That facility would directly generate numerous jobs, grow tax revenues for state and local governments, attract further investment, and support thousands of additional jobs throughout the country.

9.    The Defendants oppose coal exports on policy grounds. So they have unreasonably delayed and denied a number of permits and approvals needed to construct the proposed new coal export facility at the Millennium Bulk Terminal. And they have ceased processing other pending permits for the proposed facility, without basis in law.

10.    The Defendants' delays and denials are not consistent with normal permitting procedures. They have, among other things, improperly expanded the scope of their environmental review, arbitrarily and capriciously declined to approve a sublease, and illegally refused to grant a Clean Water Act section 401 water quality certification based on alleged effects that are exclusively within federal jurisdiction.

11.    The Defendants' actions have both the intent and effect of discriminating against and unduly burdening foreign and interstate commerce, in violation of the United States Constitution's dormant commerce clause, the federal ICC Termination Act, and the federal Ports and Waterways Safety Act.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

## II.      JURISDICTION AND VENUE

12.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983 because this controversy arises under the Constitution and laws of the United States, and involves the deprivation, under state law, of rights and privileges secured by the United States Constitution and acts of Congress.

13.      This Court also has jurisdiction pursuant to its inherent equitable powers to enforce federal law and to enjoin state actions that are preempted by federal law.

14.      The requested relief is proper under 28 U.S.C. §§ 2201 and 2202.

15.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III.      PARTIES

16.      Lighthouse is a privately held company headquartered in Salt Lake City, Utah. Lighthouse's wholly owned subsidiary companies include the parent company of entities owning or leasing coal mining rights, and operating two coal mines (one in Montana and one in Wyoming); the parent company of entities that have proposed to develop port facilities in Oregon and Washington to export coal from Wyoming, Montana, Utah, and Colorado, including the company that has proposed an export terminal in Longview, Washington; and an entity that contracts with rail carriers, ports, and customers in Asian markets for delivery of coal and is currently seeking additional port capacity to export coal through terminals with economic access to foreign markets.[1]

_____

[1] Lighthouse was previously known as Ambre Energy North America, Inc. In 2014, Ambre Energy North America, Inc. separated from its Australian parent company, Ambre Energy Limited, when it recapitalized. Ambre Energy North America, Inc. announced that it had changed its name to Lighthouse Resources, Inc. in April 2015.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 4 OF 53

[4822-5378-3084]

17.    LHR Coal, LLC (LHR Coal) is a wholly owned subsidiary of Lighthouse. LHR Coal, through its subsidiaries, is in the business of owning and operating upstream production and mining assets, including coal mines. LHR Coal's subsidiaries own or lease coal mining rights, coal loading and rail infrastructure, and operate existing coal mines in Montana and Wyoming.

18.    LHR Infrastructure, LLC (LHR Infrastructure) is a wholly owned subsidiary of Lighthouse. LHR Infrastructure, through its subsidiaries, is in the business of identifying and developing infrastructure projects, including coal export facilities, to connect downstream demand to upstream supply. LHR Infrastructure's subsidiaries own or lease assets to develop marine terminals for transloading bulk products, including coal, from rail to marine vessels.

19.    Millennium Bulk Terminals-Longview, LLC (MBT Longview) is a wholly owned subsidiary of LHR Infrastructure and operates an existing bulk product marine terminal in Longview, Washington. MBT Longview has proposed a coal export terminal at that site to receive coal from Lighthouse and other third party customers for loading and shipment to customers in northeast Asia, presently including Japan and South Korea.

20.    Lighthouse Products, LLC (LHP) is a wholly owned subsidiary of Lighthouse. LHP markets, sells, and delivers products to its customers. It is in the business of supplying Lighthouse products to meet downstream demand. LHP delivers coal mined by LHR Coal subsidiaries in Montana and Wyoming to Asian customers at the point of sale, which is usually free-on-board (FOB) an ocean-going vessel at a coal export terminal on the Pacific Coast.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5 OF 53
(                                          )
[4822-5378-3084]

21.     Jay Inslee is the current governor of the state of Washington, an office he assumed in January 2013. He is being sued in his official capacity.

22.     Maia Bellon is the current director of the Washington Department of Ecology. She has served in that role since she was appointed by Governor Inslee in February 2013. She is being sued in her official capacity.

23.     Hilary S. Franz is the current Washington Commissioner of Public Lands. She was elected to that position in November 2016 and sworn in on January 11, 2017. She is being sued in her official capacity.

### IV.     FACTUAL BACKGROUND

**A.     Asian demand for coal**

24.     The top five coal-importing countries in the world are located in Asia. Together these countries accounted for 63% of global coal imports in 2014.

25.     Japan and South Korea, both of which are among the world's top five coal importers, have each signed the Paris Accord.

26.     Despite having the largest coal reserves in the world, the United States has historically supplied less than five percent of Asia's demand for imported thermal coal. The United States accordingly has pursued a policy of facilitating coal exports to Asia.

27.     Japan in particular has limited domestic energy resources.[2] Following the Fukushima nuclear power plant accident, Japan imports more than 90% of its primary energy.

---

[2] Limited land mass limits Japan's options. *The Footprint of Energy: Land of U.S. Electricity Production,* STRATA (June 2017), https://www.strata.org/pdf/2017/footprints-full.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 6 OF 63
[4822-5378-3084]

28.     Japan is installing new, clean coal plant technologies to meet environmental targets.[3] Overall, "Japanese companies plan to develop about 45 additional coal power plants, adding more than 20 GW of capacity in the next decade."[4]

29.     Japan has specifically identified Powder River Basin (PRB) coal from the United States as having the quality characteristics that are desirable for Japan's next generation of high efficiency, low emissions coal-fired power plants.[5]

30.     South Korea—the world's ninth-largest energy consumer in 2015—lacks domestic energy reserves, making it one of the top energy importers in the world.

31.     In recent years, South Korea has also scaled back its long-term reliance on nuclear power and increased its coal imports from 131 million short tons in 2010 to 149 million short tons in 2015.[6]

32.     South Korea is the fourth-largest importer of coal in the world. Coal accounts for 28% of South Korea's installed electricity generating capacity, and 20 new coal-fired power plants are scheduled to enter service by 2022. South Korean energy companies also seek additional U.S. coal imports to diversify the sources of their coal supply.

---

[3] *See* METI, Clean Coal Technology in Japan (Sept. 6, 2017), http://www.jcoal.or.jp/event/upload/15.%20Clean%20Coal%20Technology%20in%20Japan.pdf.

[4] *Japan: Overview*, U.S. ENERGY INFO. ADMIN. (Feb. 2, 2017), https://www.eia.gov/beta/international/analysis.cfm?iso=JPN.

[5] Yoshiyuki Wakabayashi, *Clean Coal Technologies for IGCC Power Plants*, MITSUBISHI HITACHI POWER SYSTEMS (Sept. 6, 2017), http://www.jcoal.or.jp/event/upload/16.%20Clean%20Coal%20Technologies%20for%20IGCC%20Power%20Plants%20%28Mr.%20Wakabayashi%29%20new.pdf.

[6] *Korea, South*, U.S. ENERGY INFO. ADMIN. (Jan. 19, 2017), https://www.eia.gov/beta/international/analysis.cfm?iso=KOR.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 7 OF 53
(                              )

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

33.     Increasing its U.S. coal imports would also allow South Korea to diversify away from its dependence on imports from Indonesia and the Russian Federation.

34.     Japan, South Korea, and other U.S. allies in Asia want stable and secure energy supplies for their economies and stability in the region, especially in light of the threat from North Korea and the growing international activism of China and the Russian Federation.

**B.      Lighthouse's coal supply chain**

35.     Since 2009, Lighthouse and its affiliated companies have responded to Asian demand by pursuing a strategy to secure port capacity and deliver U.S. coal to Asia.

36.     Lighthouse, through its subsidiaries, operates a coal energy supply chain company. That means that Lighthouse manages or arranges the mining of coal, the transfer of coal from rail to ocean-going vessels, and the sale of coal to end users.

37.     Since 2011, Lighthouse subsidiary LHR Coal has owned and leased coal mining rights, maintained coal loading infrastructure, and operated coal mines in Montana and Wyoming through its own subsidiary companies. These mining properties were acquired primarily to meet current and projected demand from Asian customers.

38.     Under federal regulations, LHR Coal's subsidiaries are obligated to seek the maximum economic recovery for minerals mined on federal lands. Lighthouse's efforts to export coal to Asia are part of its effort to seek maximum economic recovery.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

39.     One of LHR Coal's subsidiaries owns and operates the Decker Coal Mine in southern Montana. The Decker mine, which has been in operation since the early 1970s, is on the northern corridor of the BNSF railroad.

40.     The Decker mine has two load out facilities, each of which can handle up to 14 million tons of coal per year. The mine has over 60,000 acres of mineral and surface rights under lease from federal, state, and private mineral owners.

41.     Coal from the Decker mine is in high demand from overseas customers. Reserves at Decker are approximately 241 million tons, with additional resources estimated at over 1.2 billion tons.

42.     Another one of LHR Coal's subsidiaries owns a 50% interest in, and operates, the Black Butte mine in Wyoming. The Black Butte mine, which has been in operation since the 1970s, is on the Union Pacific railroad.

43.     The Black Butte mine has a rail load out facility capable of handling up to 14.5 million tons of coal per year. Reserves at Black Butte are over 50 million tons, with additional resources estimated at over 90 million tons.

44.     LHR Coal's subsidiary Big Horn Coal Company also has rights to approximately 40 million tons of recoverable coal leased from the State of Wyoming.

45.     LHP is party to an amended ten-year contract with a customer in South Korea that was originally executed on May 11, 2012 to deliver two million metric tons per year with the option for the customer to elect to receive an additional one million metric tons per year (Contract #1).

46.     LHP is party to another amended contract with a second customer in South Korea, originally executed as a ten-year contract on June 5, 2012, to deliver one

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 9 OF 53 )
[4822-5378-3084]

million metric tons per year with the option for the customer to purchase an additional one million tons per year (Contract #2).

47.   LHP also sold a trial shipment of coal to other potential Japanese customers, but is unable to execute long-term contracts for larger volumes until it secures more coal export capacity and can be more certain about when deliveries can be made.

48.   Other customers in South Korea, Japan, and Taiwan have expressed interest in purchasing coal from Lighthouse and its subsidiaries.

49.   The lack of sufficient economic west coast coal export capacity has prevented delivery of the coal volumes specified in both Contract #1 and Contract #2. As a result, the contracts had to be amended in December 2015 to make both subject to termination for failure to deliver.

50.   At present, LHP supplies coal to its Asian customers by shipping coal out of a Canadian port. That port has not contracted sufficient capacity to LHP to fulfill the contracts to which LHP is a party and is approximately 250 miles farther from the mines than the Millennium Bulk Terminal, resulting in increased shipping costs.

51.   LHP needs additional economic coal export capacity to fulfill its contracts and meet market demand.

C.   **Lighthouse's efforts to secure coal export capacity**

52.   Given that there is not sufficient economic coal export capacity for Lighthouse and its subsidiaries to fulfill existing contracts and meet increasing Asian market demand, Lighthouse and predecessor entities have been working to identify, contract with, and/or develop new coal export facilities on the West Coast since 2009.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 10 OF 53
(                                        )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

53.     In 2010, Lighthouse investigated over two dozen potential coal export locations, including 14 potential sites in Washington, 5 in Oregon, 4 in California, and 4 in British Columbia.

54.     Based on this thorough investigation, Lighthouse concluded that the Millennium Bulk Terminal brownfield site in Longview, Washington (the Terminal) was the preferred site for coal exports. It entered into an asset purchase and sale agreement that ultimately resulted in its acquisition of substantially all Terminal assets.

55.     In July 2010, Washington State offered potential tax abatement, rail infrastructure improvements, assistance to streamline permitting, and job training incentives to redevelop the Terminal into a bulk products facility that included coal exports.

56.     While it sought to acquire and permit the Millennium Bulk Terminal facility, LHP continued searching for other coal export capacity.

57.     Starting in 2011, Lighthouse—through LHR Infrastructure and its subsidiaries Coyote Island Terminal, LLC and Pacific Transloading, LLC—proposed to construct the Morrow Pacific Project, a coal export facility at the Port of Morrow near Boardman, Oregon.

58.     The Port of Morrow is the second-busiest port in Oregon, and has more than 12,000 acres of land that is used and available for a variety of industries. Oregon law (ORS 777.250) gives the port very broad operational authority, including for "storing, warehousing, distributing, or selling or servicing any products of agriculture, mining or industry . . . ."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 11 OF 53
(                              )
[4822-5378-3084]

59.     After taking two and one-half years to review it, the Oregon Department of State Lands denied Coyote Island Terminal's application for a removal-fill permit to construct an industrial dock. Despite the heavy commercial use and industrial purpose of the Port, the Department asserted that the Port of Morrow's busy waters were best used for fishing. That decision effectively blocked U.S. coal exports through Oregon.

**D.     The proposed Millennium Bulk Terminal coal export facility**

60.     The proposed Millennium Bulk Terminal coal export facility would provide sufficient capacity to enable Lighthouse's subsidiaries to economically fulfill existing and new contracts with Asian customers by shipping coal from Montana and Wyoming through the Terminal and onto ocean-going vessels bound for Asia.

61.     The Terminal has been an active industrial site since 1941, with an active industrial dock that was used for decades before MBT Longview acquired it in 2011 with the goal of expanding it into a state-of-the-art coal export facility.

62.     At present, the Terminal receives coal by rail weekly, which is then loaded onto trucks for distribution. The Terminal also maintains readiness to unload shiploads of alumina imported primarily from Australia for transportation by rail to an aluminum smelting facility in Wenatchee, Washington.

63.     A 2008 Aquatic Lands Lease between the State of Washington and Northwest Alloys, Inc. (the Aquatic Lands Lease) expressly allows coal to be handled over and across the Terminal's existing dock and two new planned docks.

64.     The Aquatic Lands Lease further specifies that the "State believes that this Lease is consistent with the Public Trust Doctrine" and makes clear that approval of a sublease "shall not be unreasonably conditioned or withheld."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 12 OF 53
(                                              )
[4822-5378-3084]

65.     MBT Longview acquired the Terminal assets and executed a ground lease with Northwest Alloys, Inc. (the "Ground Lease") in 2011. At the same time, MBT Longview agreed to certain performance obligations (including but not limited environmental remediation) for the property, including on the aquatic lands, the uplands of the proposed coal export terminal, and the uplands of the existing bulk terminal.

66.     Lighthouse is a guarantor of MBT Longview's performance under the Ground Lease. MBT Longview and Northwest Alloys, Inc. further intended that MBT Longview would become a sublessee under the Aquatic Lands Lease.

67.     The Terminal is connected to the existing national rail freight network, already receives common carrier service from BNSF, and is capable of receiving trains from Union Pacific.

68.     The Terminal is on the Columbia River, which has been designated by the U.S. Department of Transportation Maritime Administration as a Marine Highway for the transportation of commerce. The river was deepened pursuant to an Act of Congress—at a cost exceeding $180 million—so it could handle more cargo and facilitate growth.

69.     At full build-out the Terminal would be capable of exporting 44 million metric tons of coal, which would both satisfy the export requirements of Lighthouse and its subsidiaries and provide export capacity to third party shippers.

70.     MBT Longview began the permitting process for the proposed Terminal coal export facility in February 2012. That process requires MBT Longview to acquire roughly two dozen separate federal and state plans, permits, and approvals.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 13 OF 53

(                                    )

[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

E.      **Benefits of the Millennium Bulk Terminal**

71.     The Millennium Bulk Terminal has been underutilized for more than 15 years. Lighthouse's and MBT Longview's plans would redevelop it into a world-class port facility.

72.     In part due to underutilization of facilities like the Terminal, Cowlitz County has faced economic challenges that have left it lagging behind state averages for employment. The proposed coal export facility at the Terminal is expected to add over 1,300 construction jobs and approximately 135 family-wage jobs.[7]

73.     The Terminal would generate substantial direct tax receipts at the state and local levels.[8] A 2012 economic study estimated that the Terminal would generate $146 million in tax revenues over a 30-year period, with approximately 26% of this revenue going to the County, 54% to the State, and 20% to special purpose districts.[9]

74.     Investment in the Terminal would also attract further investment to improve infrastructure around Cowlitz County, resulting in upgrades to rail and other methods of transportation. Improved freight transportation along the Columbia River would increase the value and attractiveness of other industrial properties,[10] including the Port of Longview's proposed port development at Barlow Point, which is adjacent to the Millennium Site.

---

[7] COWLITZ CTY. & WASH. DEP'T ECOLOGY, MBT Longview SEPA Final Environmental Impact Statement 2-2 (Apr. 28, 2017), http://millenniumbulkeiswa.gov/sepa-eis.html.

[8] *Id.* at 2-1.

[9] BERK, ECONOMIC & FISCAL IMPACT OF MILLENNIUM BULK TERMINALS LONGVIEW 25 (Apr. 12, 2012), http://millenniumbulk.com/wp-content/uploads/2014/10/Economic-Study-Full-Report.pdf.

[10] *Id.* at Executive Summary.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 14 OF 53
(                            )
[4822-5378-3084]

75.     In addition to the local jobs in Cowlitz County, the Terminal at full build-out would support thousands of direct and indirect jobs throughout the country,[11] and bring substantial benefits to the economies of Washington's sister states, including Montana and Wyoming.

76.     In 2015, Montana coal sales generated nearly $115 million in federal and state revenue, much of which funds schools, state parks, libraries, and local infrastructure.[12] Because Montana holds about one-fourth of America's demonstrated coal reserves, coal export is essential to the state's economy.[13]

77.     Likewise, coal production and export is a cornerstone of Wyoming's economy.[14] The majority of the coal mined in Wyoming is exported by rail out of state or out of the country.[15] In 2012, coal accounted for 14% of gross state product, 9.3% of total labor income, and 5.9% of total employment in Wyoming.[16]

---

[11] *See* ERNST & YOUNG, U.S. COAL EXPORTS: NATIONAL AND STATE ECONOMIC CONTRIBUTIONS 8-9, 68 (May 2013), http://www.uscoalexports.org/data/National-and-State-Economic-Contributions-5-22-13.pdf.

[12] *See* Dep't of Interior, *Explore Data: Montana*, NAT. RESOURCES REVENUE DATA, https://revenuedata.doi.gov/explore/MT/#revenue (last visited Dec. 19, 2017).  An average train load of coal in Montana is assessed approximately $30,800 in federal, state and local taxes. *Working for the Coal Industry in Montana*, MONTANA COAL COUNCIL, http://www.montanacoalcouncil.com/ (last visited Dec. 19, 2017).

[13] *See Montana*, U.S. ENERGY INFO. ADMIN. (Jan. 19, 2017), https://www.eia.gov/state/analysis.php?sid=MT.

[14] *See* State of Wyoming Mot. for Summ. Determination 5, Coyote Island Terminal LLC, OAH Case No.: 1403883 (May 6, 2016), https://drive.google.com/file/d/0B_4EQ9PebvQIdmx6NHhBemkwYkU/view (Wyoming produced 401,457,074 tons of coal in 2012, which represented 39 percent of the entire nation's coal production).

[15] *Id.*

[16] ROBERT GODBY ET AL., CTR. FOR ENERGY ECON. & PUB. POLICY, THE IMPACT OF THE COAL ECONOMY ON WYOMING 4 (Feb. 2015), https://www.uwyo.edu/cee/_files/docs/wia_coal_full-report.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 15 OF 53
(                              )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

78.     The Terminal also has the potential to increase annual U.S. coal exports by 44 million metric tons, increasing the annual value of U.S. exports by more than $2.5 billion and shrinking U.S. trade deficits with Asian trading partners.[17]

79.     At the same time, the Terminal will provide Asian markets greater access to coal mined under U.S. laws and regulations, giving Asian customers the alternative they seek to achieve their energy policy objectives, including by meeting their environmental commitments.

**F.     Defendants' opposition to coal and coal exports**

80.     The Defendants have all expressed unyielding opposition to coal and coal exports.

81.     Defendant Inslee co-authored a 2007 book titled *Apollo's Fire: Igniting America's Clean Energy Economy* in which he opines that coal is "killing us."[18] More specifically, he claims that "[s]hould we fail to restrain the growth of $CO_2$ emissions" from coal, "all six billion of us on this little spaceship are at risk . . . ."[19]

82.     In the same part of his book, Defendant Inslee claims that "[c]oal is in a race with cars to be the greatest danger to our climate."[20] He also specifically points to the growth of coal use in Asia as a looming threat to the environment.[21]

---

[17] 48 million short tons x $57.87 per short ton = $2.7 billion, using Platt's North East Asian Thermal Coal Index Netback Price at Vancouver BC, dated November 24, 2017.

[18] Jay Inslee & Bracken Hendricks, Apollo's Fire: Igniting America's Clean Energy Economy 199 (2008).

[19] *Id*. at 200.

[20] *Id*.

[21] *Id*. at 201.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 16 OF 53

(                              )

[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

83.    In November 2012, following Defendant Inslee's election as Governor of Washington, an article reported that state and national environmental groups viewed him as "their best chance to block the coal ports [in Washington]."[22] According to the article, environmental groups believed that Defendant Inslee "could push rigorous environmental reviews that could slow and complicate the permitting process or impose so many conditions that it would be difficult for developers to build the terminals."[23]

84.    During his first inaugural address as the Governor of Washington, Governor Inslee proclaimed that he would not "consciously accept the dangers of climate change" and described Washington State as the "first responders" who must help "solve this global problem."[24]

85.    During his first press conference as Governor, Defendant Inslee discussed his concerns about the "ramifications" of "burn[ing] the enormous amounts of Powder River Basin coal that are exported through our ports." He called permitting those exports "the largest decision we will be making as a state . . . certainly during my lifetime and nothing comes close to it."[25]

---

[22] Maria Gallucci, *Will Washington's Super Green Governor Take Up the Fight Against Coal Exports?*, INSIDE CLIMATE NEWS (Nov. 26, 2012), https://insideclimatenews.org/news/20121119/washington-state-coal-export-terminals-northwest-governor-jay-inslee-clean-energy-economy-oregon-california-epa.

[23] *Id.*

[24] Jay Inslee, Governor of Wash., 2013 Inaugural Address: The World Will Not Wait (Jan. 16, 2013), http://www.governor.wa.gov/sites/default/files/speeches/20130116_Inaugural.pdf.

[25] Jessica Goad, *Governor Inslee Calls Coal Exports "The Largest Decision We Will Be Making as a State from a Carbon Pollution Standpoint,"* THINKPROGRESS (Jan. 22, 2013, 7:56 PM), https://thinkprogress.org/governor-inslee-calls-coal-exports-the-largest-decision-we-will-be-making-as-a-state-from-a-carbon-9c73e7ba1079/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 17 OF 53
(                                      )
[4822-5378-3084]

86.     In May 2014, Defendant Inslee, speaking at a "Climate Solutions" fundraiser, touted his view that Washingtonians could be "leaders" by taking advantage of Washington's "attributes as a state"—meaning that states on "the West Coast" could fight climate change by preventing coal exports.[26]

87.     Following the 2016 U.S. presidential election, Defendant Inslee claimed that President Trump "has made it clear that he wants to go backwards on our efforts to fight climate change," and promised that Washington would continue its "aggressive effort to fight climate change."[27] He went on: "No matter what happens in Washington D.C., Washington State is going to fight climate change, and we're going to win . . . ."[28]

88.     In October 2017, while speaking at Climate Change Town Hall meeting, Inslee indicated that "you don't want to lock yourself into infrastructure that is going to be there 50 years to essentially expand fossil fuel. We do not want to get into that mindset for making that kind of decision."[29]

89.     In another Climate Change Town Hall meeting, Defendant Inslee again referenced Millennium, warned against "build[ing] an infrastructure that locks us into fossil fuels," and asserted that Washington State will "do some great things to reduce our carbon pollution from all sources wherever it is, so we can reduce carbon whether it is produced in China, or Montana, or Brazil . . . ."[30]

---

[26] *See* Climate Solutions, *Governor Jay Inslee on Washington's Role in Climate Solutions*, YOUTUBE (May 20, 2014), https://www.youtube.com/watch?v=5njtFvVjMn0&feature=youtu.be.

[27] *Governor Jay Inslee Press Conference*, TVW (Mar. 25, 2017), www.tvw.org/watch/?eventID=2017031315.
[28] *Id.*

[29] 350 Seattle, *Climate Townhall with Gov Inslee Q&A 10 19 2017*, YOUTUBE (Oct. 24, 2017), https://www.youtube.com/watch?v=h_qohIqCYx8&feature=youtu.be.

[30] *Governor Inslee Climate Change Town Hall*, TVW (Oct. 25, 2017, 2:45 PM), www.tvw.org/watch/?eventID=2017101081.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 18 OF 53
(                         )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

90.     Defendant Inslee's policy goal of stopping coal exports is implemented in large part through the Washington Department of Ecology.

91.     Defendant Bellon was appointed by Defendant Inslee to the position of Director of the Washington Department of Ecology in February 2013. In that position, she has worked with Defendant Inslee to oppose coal exports.

92.     In November 2013, Defendant Bellon explained during a panel discussion that "This effort starts with Governor Inslee's vision, his mission . . . . I've been asked to lead the sustainable energy and clean environment goal area . . . . Governor Inslee is pushing us hard on 'You don't do your work in a silo. You check in with [other administration officials]' . . . Something that I may push from the environmental or water quality perspective may be problematic in a different area."[31]

93.     When the Washington Department of Ecology (Ecology) published its Environmental Impact Statement (EIS) for the Millennium Bulk Terminal in April 2017, its official Twitter account tweeted out four "key findings" from the EIS, while paying little attention the EIS's findings of no significant adverse impact.

94.     When Ecology tweeted a "key finding" that "[t]he project would increase carbon pollution globally by 2 million metric tons," Defendant Bellon retweeted that statement.

95.     Despite Ecology having jurisdiction over several pending and future permits for the Terminal project, Defendant Bellon also tweeted in April 2017 that

---

[31] *Panel Discussion on "A New Direction in Washington" with Maia Bellon (Director, Dept. of Ecology), Carol Nelson (Director, Dept. of Revenue), and Joel Sacks (Director, Dept. of Labor & Industries),* TVW (Nov. 14, 2013, 9:00 AM), https://www.tvw.org/watch/?eventID=2013111061.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 19 OF 53
( )

[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

"[t]he proposed coal terminal in Longview would significantly impact the environment . . . ."

96.     Defendant Franz campaigned against coal exports when running for Washington State Lands Commissioner, indicating in response to a questionnaire that she "opposes coal and oil exports from Washington ports."[32]

97.     Defendant Franz's campaign website also argued that coal "is projected to be an economically outdated energy source within 10 years," and praised the U.S. Army Corps of Engineers for "suspend[ing] the Cherry Point Coal Terminal project," another proposed coal export terminal in Washington State.[33]

98.     In sum, all the Defendants steadfastly oppose the use of coal as a source of energy and, more specifically, the export of coal to Asian markets.

99.     As public officials of the state of Washington, the Defendants have translated their personal opposition to coal exports into official state policy by actively thwarting Lighthouse's plans to ship coal from Montana and Wyoming to the proposed Millennium Bulk Terminal for export to Asia.

G.     **Defendants' coordination with other states to block coal exports**

100.     On information and belief, the Defendants have also coordinated with officials in Oregon and California in a "subnational" effort to prevent any new coal exports from the United States Pacific Coast to Asian markets.

---

[32] TJ Martinelli, *Different Visions for Public Lands Chief*, THE LENS (Sept. 7, 2016), http://thelens.news/2016/09/07/a-different-visions-for-public-lands-chief/; *see 46th District Democrats Legislative & Statewide Questionnaire*, THE LENS, http://thelens.news/wp-content/uploads/2016/09/CommissionerofPublicLands_HIlaryFranz.pdf 7 (last visited Dec. 19, 2017).

[33] Hilary Franz, *Issue Priorities*, ELECT HILARY FRANZ, http://www.hilaryfranz.com/issues/ (last visited Dec. 19, 2017).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 20 OF 53
(                              )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

101.    The Pacific Coast Collaborative (PCC), a partnership between Washington, Oregon, California, Alaska, and British Columbia that was initially formed in June 2008, has been used to coordinate policies and actions between the states of Oregon, Washington, and California, as well as British Columbia.

102.    Opposition to coal exports originated with one PCC member state at least as early as February 2011, when then-Oregon First Lady Cylvia Hayes responded to an email from the environmental group Climate Solutions about the proposed Millennium Bulk Terminal coal export facility.[34]

103.    Hayes and her fiancée, then-Oregon Governor John Kitzhaber actively worked to stop coal exports in Oregon and expanded collaboration with officials in Washington, including one or more of the Defendants, in an attempt to block all coal exports from the West Coast.

104.    On information and belief, subnational efforts to prevent coal exports from the West Coast by PCC member states were also intertwined with the efforts of environmental groups seeking to block coal exports to Asia.

105.    For instance, while acting as First Lady of Oregon, Hayes was being paid by the Clean Economy Development Center to develop "a strategic approach to preventing the development of coal export facilities on the west coast."[35] A substantial part of that compensation came from the Energy Foundation, a group that also worked

---

[34] *See* E-mail from Cylvia Hayes, CEO, 3E Strategies, to KC Golden, Senior Policy Advisor, Climate Solutions (Feb. 19, 2011), http://media.oregonlive.com/politics_impact/other/Nelson%20Hayes%20email.pdf; *see also* Anne Mulkern, *West Coast Pact on Climate Action Pulled into Former Ore. Governor's Scandal*, E&ENEWS (Feb. 23, 2015), https://www.eenews.net/stories/1060013822 .

[35] Nick Budnick, *Kitzhaber Told Staff State Policies Should Match Cylvia Hayes' Paid Agenda*, OREGON LIVE (July 20, 2015, 1:47 PM), http://www.oregonlive.com/politics/index.ssf/2015/07/kitzhaber_told_staff_state_pol.html.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 21 OF 53
(                               )
[4822-5378-3084]

with Governor Kitzhaber to align anti-coal policies in Washington, Oregon, and California.[36]

106.    Hayes worked with Governor Kitzhaber to ensure that Oregon's policies and decisions opposing coal exports were consistent with the positions taken by the environmental groups who paid her salary. They also worked with the Defendants to help Washington adopt the same anti-coal export policies.

107.    In December 2012, before Defendant Inslee was sworn into office, Oregon Governor Kitzhaber left him a message to invite his participation in a project that would create a systemic case against investment in west coast coal export infrastructure.

108.    In March 2013, Defendant Inslee and Governor Kitzhaber co-authored a letter to the chair of the White House Council on Environmental Quality that decried the "inevitable consequences of coal leasing and coal export . . . [which] are likely to lead to long-term investments in coal generation in Asia" and urged the federal government "in the strongest possible terms to undertake and complete a thorough examination of the greenhouse gas and other air quality effects of continued coal leasing and export . . . ."[37]

109.    The Defendants also continued to coordinate with Oregon and California officials through the PCC, using the PCC to "present united fronts opposing new coal

---

[36] Nick Budnick, *Cylvia Hayes Scandal: Kitzhaber Associates Help Create Jobs for Her That Had Oregon Influence in Mind*, OREGONLIVE (Feb. 9, 2015, 9:15 PM), http://www.oregonlive.com/politics/index.ssf/2015/02/cylvia_hayes_kitzhaber_associa.html.

[37] Letter from Jay Inslee, Governor of Wash., and John Kitzhaber, Governor of Or., to Nancy Sutley, Chair, Council Envtl. Quality (Mar. 25, 2013), http://critfc.org/wp-content/uploads/2012/10/sutley-coal.pdf?x78172.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 22 OF 53
(                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

export facilities on the West Coast," and seeking grant funding for the PCC from environmental organizations opposed to coal exports.[38]

110.    On October 28, 2013, as part of their public efforts with the PCC, California, Oregon, Washington, and British Columbia signed an "Action Plan on Climate and Energy" that agreed to "meaningful coordination and linkage between states and provinces in North America . . . [to] improve the effectiveness of [their] actions, increase their overall positive impact and build momentum for broader international coordination to combat climate change."

111.    Officials in Oregon also sought funding for the PCC from groups opposed to coal exports with the idea that the states on the west coast, including Washington, could work with those anti-coal export groups as a unified "network."

112.    During an April 19, 2014 speech to the League of Conservation Voters, Governor Kitzhaber made it clear that he intended to stop all coal exports: "It is time once and for all to say no to coal exports from the Pacific Northwest . . . . The future of Oregon and the West Coast does not lie in nineteenth century energy sources."[39]

113.    On October 8, 2014, *Willamette Week* published a story explaining how First Lady Hayes had misused her position in Governor Kitzhaber's administration. In January 2015, it came to light that Hayes had not disclosed her contract with the Clean Economy Development Center in her ethics filings.

_____

[38] *See  Inslee's Enviro Outsourcing: 5 Things We Learned from Jay Manning's Grant Proposals*, SHIFT WA (June 2, 2014), https://shiftwa.org/5-things-we-learned-from-jay-mannings-grant-proposals/.

[39] Rob Davis, *Oregon Gov. John Kitzhaber Firmly Opposes Ambre Energy Coal Export Terminal, Sets May Deadline*, OREGONLIVE (Apr. 25, 2015, 12:54 PM), http://www.oregonlive.com/environment/index.ssf/2014/04/oregon_gov_john_kitzhaber_firm.html; Ben Adler, *Kitzhaber is on His Way Out, But Expect Oregon to Keep Being a Green Leader*, GRIST (Feb. 14, 2015), http://grist.org/politics/kitzhaber-is-on-his-way-out-but-oregon-should-continue-being-a-green-leader/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 23 OF 53
(                                    )
[4822-5378-3084]

114.    On February 4, 2015, the Oregonian editorial board called for Kitzhaber to resign. On February 9, 2015, Oregon Attorney General Ellen Rosenblum announced a criminal investigation. On February 13, the U.S. Attorney's Office issued a subpoena for records.[40]

115.    Kitzhaber resigned as Governor of Oregon effective February 18, 2015, but PCC member states continued to act in opposition to coal exports.

116.    On June 1, 2016, members of the PCC—British Columbia, California, Oregon, and Washington—together with the cities of Los Angeles, Oakland, Portland, San Francisco, Seattle, and Vancouver, signed the "Pacific North America Climate Leadership Agreement." The Preamble to that agreement noted that the parties are "embracing the Pacific Coast's opportunity to demonstrate global leadership by providing a model for decisive, coordinated subnational climate action . . . ."

H.    **Washington's environmental review of the proposed Terminal**

117.    In November 2010, MBT Longview received a Shoreline Substantial Development Permit from Cowlitz County for initial development of a coal export facility at the Terminal. Several environmental groups appealed that decision.

118.    The Washington Department of Ecology filed to intervene in the appeal. Ecology's Southwest Regional Office claimed in an email that Ecology was not "suggesting that the SEPA analysis should include emissions that occur from the burning of coal in China." Instead, Ecology's position was that the greenhouse gas

---

[40] *See* Jonathan Cooper, *Feds Subpoena Records Pertaining to Departing Oregon Gov.*, AP NEWS (Feb. 14, 2014), https://apnews.com/d2b8cb51c03947df859fe26b583bd0f3.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 24 OF 53
(                              )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

emissions inventory should evaluate transportation impacts from the border of Washington to the three mile territorial limit.

119.    Rather than litigate the appeal of its original Shoreline Development Permit, MBT Longview withdrew its permit application and began a new process that would evaluate the environmental effects of the possible expansion of coal exports at the Terminal—including preparation of an EIS.

120.    In October 2012, the U.S. Army Corps of Engineers, Washington Department of Ecology, and Cowlitz County agreed to collaborate on a joint National Environmental Policy Act (NEPA)/State Environmental Policy Act (SEPA) document. Approximately three years later, after Defendants Inslee and Bellon were in office, the parties amended their Memorandum of Understanding to allow separate state and federal environmental reviews.

121.    The separation of the federal and state environmental review process stemmed from a disagreement over the scope of the document. Defendant Bellon explained on August 22, 2013 that the State's broader scope of environmental review was based on "the end use of a product" and that "there is no speculation as to the end use of the exported coal; it will be combusted for thermal power."[41]

122.    In other words, Defendant Bellon explicitly proposed to expand the environmental review of proposed Terminal project beyond the scope originally

---

[41] Letter from Maia Bellon, Dir. of Wash. Dept. of Ecology, to Doug Erickson, Wash. State Senator 4, 7 (Aug. 22, 2013), http://washingtonports.org/wp-content/uploads/2013/11/Annual13-CLE-EcologyLetterGatewayReview.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 25 OF 53
(                                          )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

envisioned with the federal government solely because of the commodity being exported: coal.[42]

123.   In November 2013, just 2 days after the public scoping comment period to define the scope of the Millennium Bulk Terminal EIS ended, Governor Kitzhaber praised Defendant Inslee for assuring that Washington's review of coal export facilities would include a full examination of upstream and downstream impacts, including rail effects and the effects of coal's use as a fuel in Asia.

124.   In February 2014, Ecology formally decided that the Draft EIS for the Terminal project would evaluate impacts beyond the State's borders, including impacts from lifecycle greenhouse gas emissions and transportation that occurs outside of the project area and the State of Washington. This change in scope was inconsistent with both Ecology's stated position in 2011 and its original scoping agreement with the federal government.

125.   The U.S. Army Corps of Engineers declined to follow Ecology's decision to conduct an expansive environmental review.

126.   The Corps explained its scoping decision in a February 2014 Memorandum of Record. In sum, the Corps concluded that Ecology's broader analysis

---

[42] The proposed MBT Longview coal export terminal is almost six years into the permitting process and it has undergone repetitive, burdensome, and unnecessarily complex government processes. As of October 2017, MBT Longview has invested about $15 million in permitting. A report by James Bacchus and Rosa Jeong of the law firm Greenberg Traurig LLP prepared for the National Association of Manufacturers noted that expanded SEPA review could constitute export restrictions under World Trade Organization rules. *See* JAMES BACCHUS & ROSA JEONG, GREENBERG TRAURIG LLP, LNG AND COAL: UNREASONABLE DELAYS IN APPROVING EXPORTS LIKELY VIOLATE INTERNATIONAL TREATY OBLIGATIONS 3-5 (Nov. 2013), http://www.nam.org/Issues/Energy/LNG-and-Coal-Report-NOV-2013/LNG-COAL-Report.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 26 OF 53
(                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

infringed on numerous areas over which "other Federal agencies may have regulatory control."

127.    On information and belief, Defendant Inslee and Defendant Bellon influenced the scope and preparation of the EIS in a manner to include factors over which Washington State has no jurisdiction, some of which are exclusively under federal jurisdiction.

128.    In June 2016, following publication of the state's Draft EIS, Defendant Bellon reiterated the State of Washington's goal of being a national and global leader in opposing the use of carbon-based fuels, and argued that if Washington, Oregon, and California show leadership, then "others will fall in line."[43]

129.    During the same June 2016 interview, Defendant Bellon acknowledged that the state has little authority to regulate rail transportation, and that if a recently passed law went further, it would be "beyond our authority again and . . . interfering with commerce clause concepts."[44]

130.    The unusually broad, global scope of analysis for the Final EIS is just one of the ways that the Defendants undermined the Terminal expansion project's goal of exporting U.S. coal to Asian markets.

131.    On information and belief, Defendant Inslee and Defendant Bellon also influenced the preparation of the EIS to exclude analysis that did not support their opposition to coal exports.

---

[43] Inside Olympia, Interview with WA Dept. of Ecology Director Maia Bellon, TVW (June 2, 2016, 7:00 PM), www.tvw.org/watch/?eventID=2016061084.
[44] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 27 OF 53
(                              )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

132.     For example, the draft EIS excluded the analysis of greenhouse gas emissions during coal extraction. After several comment letters noted the omission, the final EIS added two paragraphs referencing "uncertainty associated with estimated coal extraction emissions"—but entirely excluded the results of that analysis from its conclusion that the project would increase greenhouse gas emissions.

133.     This omission is particularly glaring in light of the 122-page SEPA Greenhouse Gas Emissions Technical Report—prepared by Ecology's own third-party consultant—which found that U.S. coal mining actually reduces total greenhouse gas emissions by displacing mining with higher emissions elsewhere in the world, even when accounting for uncertainty.[45]

134.     Ultimately, the Defendants used their substantive authority under SEPA to reject MBT Longview's proposal by finding that it would cause significant adverse environmental effects not reasonably capable of mitigation.

135.     In particular, the Defendants concluded that the environmental effects of a coal export facility at the Terminal could not be mitigated because those effects were subject to federal jurisdiction, and not within the state's authority to mitigate.

136.     On May 25, 2017, following publication of the Final EIS, Defendant Bellon admitted that the state subjected the Terminal project to a greater level of scrutiny because the coal it would export is "meant to be used as an end product for

_____

[45] The final EIS reported that the project increased total net annual emissions in 2028 by 1.19 million metric tons of $CO_2$ equivalent.  MBT Longview SEPA Final Environmental Impact Statement, *supra* note 4, at 5.8-19.  However, if coal extraction analysis is included as reported in the Technical Report, total net indirect annual emissions in 2028 decreases by 3.77 million metric tons of CO2 equivalent.  *See* ICF, SEPA GREENHOUSE GAS EMISSIONS TECHNICAL REP., 3-23 tbl. 67 (Apr. 2017), http://www.millenniumbulkeiswa.gov/assets/greenhouse-gas-emissions2.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 28 OF 53
(                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

combustion."[46] These comments again confirmed Defendant Bellon's opposition to coal export to Asian markets.

137.    Washington State's expanded review of the Terminal stands in sharp contrast to its treatment of the Barlow Point terminal, which is adjacent to the MBT Longview site and is served by the same rail line that serves the Terminal.

138.    At Barlow Point, the Port of Longview aims to export dry or liquid bulk commodities including bio-diesel, crude oil, methanol, potash, urea/ammonia, and wood chips.[47] State officials and agencies are actively pushing for expedited development of Barlow Point.[48] It was estimated that its environmental review process will take between 18 and 24 months.[49]

139.    The primary material difference between the Barlow Point project and the Terminal is the commodity being shipped from the Terminal: coal.

140.    Washington State's expanded review of the Terminal also stands in sharp contrast to its review of a grain export terminal that was originally proposed at the Port of Longview in or about June 2009.[50]

---

[46] Inside Olympia, Interview with Wash. Dept. of Ecology Maia Bellon, TVW (May 25, 2017, 7:00 PM), www.tvw.org/watch/?eventID=2017051094.

[47] See KPFF & PORT OF LONGVIEW, PORT OF LONGVIEW: MASTER PLAN PHASE 1 FEASIBILITY STUDY, EXECUTIVE SUMMARY REPORT 3 (Mar. 9, 2016), http://wa-portoflongview.civicplus.com/DocumentCenter/Home/View/49.

[48] See Letter from Roger Millar, Sec'y of Transp., and Dan Gatchet, Chair, Wash. State Freight Advisory Comm., to David Schumacher, Dir., Office of Fin. Mgmt., Curtis King, Chair, Senate Transp. Comm., and Judy Clibborn, Chair, House Transp. Comm. (Oct. 31, 2016), http://wa-portoflongview.civicplus.com/DocumentCenter/Home/View/70; see also DRAFT 2017 WASHINGTON STATE FREIGHT SYSTEM PLAN, WASH. STATE DEP'T OF TRANSP. (2017), https://www.wsdot.wa.gov/NR/rdonlyres/AC37124C-A761-485F-8ADI-5D673191A9B8/0/DraftFreightSystemPlanAppendices20170815.pdf; KPFF & PORT OF LONGVIEW, supra note 47 at 14.

[49] KPPF & PORT OF LONGVIEW, supra note 47 at 14.

[50] Bunge Partners with Two Leading Agribusiness Firms to Build Export Grain Terminal in the Pacific Northwest, EGT (June 1, 2009), http://www.egtgrain.com/news/release/bunge-partners-with-two-leading-agribusiness-firms-to-build-export-grain-terminal-in-the-pacific-northwest/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 29 OF 53
(                                    )

[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  ·  FACSIMILE (253) 620-6565

141.    Despite the fact that this grain export terminal also receives 110-car trains from Montana and other states, and transloads grain onto oceangoing vessels bound for Asian markets,[51] it proceeded quickly through the environmental review and permitting process. It began receiving trains in September 2011.[52]

142.    The primary material difference between the grain export terminal at the Port of Longview and the Millennium Bulk Terminal is the commodity being shipped from the Terminal: coal.

143.    The State of Washington's treatment of the Terminal further stands in contrast to its review of a 2015 Port of Seattle proposal to modernize its currently-vacant Terminal 5, including associated dredging, to allow much bigger container ships to call at that terminal.

144.    The Port of Seattle's proposed container terminal modernization project is targeted at attracting new shipping to the Northwest through upgrades that would allow Terminal 5 to handle at least 1 million more twenty foot shipping containers per year than the facility's current permits allow.

145.    SEPA review for the Port of Seattle's Terminal 5 modernization project, which was initiated in 2015, limited its analysis of GHG emissions to emissions related to the operation of the project itself. This limitation was in spite of the revitalized terminal's potential effects on the dynamics international trade in any number of products.

---

[51] Longview Export Grain Terminal, http://www.egtgrain.com/facility/.

[52] *EGT Receives First Wheat Shipment in Washington State*, EGT (Sept. 21, 2011), http://www.egtgrain.com/news/release/egt-receives-first-wheat-shipment-from-washington-state/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 30 OF 53
(                                          )
[4822-5378-3084]

146.    Ecology also did not request an analysis of GHG emissions from the trans-Pacific shipping of goods to or from the terminal, or any analysis of the market effects of a modernized terminal designed to accommodate much bigger vessels than any port in the Northwest can currently handle.

147.    The final EIS was issued in October 2016, just one year after the Port of Seattle determined that an EIS would be prepared.

148.    Again, the primary material difference between the Port of Seattle terminal expansion and the Millennium Bulk Terminal is the commodity being shipped from the Terminal: coal.

**I.    Washington State's denial of a sublease to MBT Longview**

149.    LHR Infrastructure initially approached the Washington Department of Nature Resources (DNR) in August 2010 to discuss LHR Infrastructure becoming the sublessee under the Aquatic Lands Sublease at the Terminal.

150.    After LHR Infrastructure transmitted the lessee's consent to DNR, the Department's representative indicated in an October 18 email that he had "no objections" to the sublease. He then explained that "[t]he only thing [DNR] require[s] will be the security and insurance be in place at the time or before the sublease is in place."

151.    On October 19, 2010, in a follow-up telephone conversation, the same DNR representative confirmed that his October 18 email was DNR's consent to the sublease, and that DNR would not sign a written consent because there was no one within the agency to sign such a document.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 31 OF 53
(                                    )
[4822-5378-3084]

152.    Later in October 2010, as part of the transaction for MBT Longview to acquire the Terminal assets, Northwest Alloys submitted a written request for approval of an aquatic lands sublease to MBT Longview.

153.    On November 12, 2010, four environmental groups (Sierra Club, Columbia Riverkeeper, Washington Environmental Council, and Climate Solutions) sent then-Washington DNR Commissioner, Peter Goldmark, a letter urging him to deny consent to a "sublease transfer" to LHR Infrastructure and requesting a meeting to discuss DNR's decision.

154.    Six days later, on November 18, 2010, DNR left a voice message for LHR Infrastructure's attorney to inform him that an attorney would be taking over the sublease issue.

155.    More than six years later, in January 2017, DNR announced that it would not approve the proposed sublease between Northwest Alloys and MBT Longview.

156.    Although the ostensible reason for this sublease denial was a lack of information about MBT Longview's finances and the structure of the sublease, MBT Longview had in fact provided all of the information normally required.

157.    Opponents of the Terminal project hailed DNR's decision as "a firm no to the largest coal terminal in the country."[53]

158.    Defendant Franz, who assumed leadership of the DNR just weeks after her predecessor's decision, subsequently explained that the denial of the sublease was "right" because "the answer to sustainable, long-term revitalization of our economies is

---

[53] Hal Bernton, *Departing DNR Boss Jolts Longview Coal-Terminal Plan*, THE SEATTLE TIMES (Jan. 4, 2017, 10:21 AM), https://www.seattletimes.com/seattle-news/environment/dnr-boss-rejects-longview-coal-export-loading-dock-sublease/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 32 OF 53
(                                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

best served by looking forward to the development of new technologies that protect the environment, not backward to technologies that exploit it."[54]

159.    Defendant Franz's statement is consistent with the platform she espoused when running for her current office, when she indicated that she "opposes coal and oil exports from Washington ports,"[55] but inconsistent with DNR's stated reasons for denying the sublease.

160.    When MBT Longview challenged DNR's sublease denial in Cowlitz County Superior Court, the judge ruled that DNR's decision was "arbitrary and capricious."

**J.    Washington State's denial of a Clean Water Act § 401 certification**

161.    In July 2016, MBT Longview requested a water quality certification under section 401 of the Clean Water Act (CWA) from the Washington Department of Ecology (Ecology). Obtaining that certification is a key step in securing a CWA section 404 dredge and fill permit for the Terminal project from the U.S. Army Corps of Engineers.

162.    On September 26, 2017—just 3 business days after receiving 240 pages of additional information in response to Ecology's requests and questions—Ecology denied the request for a CWA section 401 certification "with prejudice." A copy of that decision is filed with this Complaint as **Exhibit A**.

-----

[54] Marissa Luck, *Millennium Appeals State's Denial of Coal Dock Sublease*, TDN (Feb. 11, 2017), http://tdn.com/news/local/millennium-appeals-state-s-denial-of-coal-dock-sublease/article_1a70be78-0191-5eb1-bc50-4a9b4f4e78c6.html.

[55] Martinelli, *supra* note 32; *see 46th District Democrats Legislative & Statewide Questionnaire*, *supra* note 32.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 33 OF 53
(                                    )

[4822-5378-3084]

163.    Lighthouse and MBT Longview are not aware of any other instances in which Ecology denied a request for CWA section 401 certification "with prejudice." Ecology has also admitted that it does not know of other "with prejudice" 401 certification denials.

164.    Ecology's denial was not based on the water quality effects of the Terminal, as required by CWA section 401. Indeed, the SEPA EIS for the Terminal project concluded that it would not have any significant adverse effects on water quality.

165.    Unable to rely on water quality issues, Ecology denied the certification based almost entirely on effects that would be caused by rail carriers transporting coal into Washington from Montana and Wyoming, where it is being mined by LHR Coal's subsidiaries.

166.    Ecology's denial was also founded in part on the potential effects of the oceangoing vessels that would transport coal from the Terminal to LHP's customers in Asia.

167.    Defendant Bellon announced Ecology's denial of MBT Longview's request for CWA section 401 certification on her Twitter account. She has not mentioned other CWA section 401 certification decisions on Twitter.

168.    Defendant Bellon also "liked" several responses to her tweet announcing Ecology's denial, including a tweet that said "Let's keep Powering Past Coal!"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 34 OF 53
(                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

169.    In October 2017, on the heels of Ecology's section 401 denial, Defendant Inslee publicly argued that "[c]limate change policy is under attack at the federal level, making state and local action more urgent and important than ever."[56]

170.    Defendant Inslee further stated that because Washington State has "control of [its] own destiny," it has "done some very progressive things leading the country and the world to reduce carbon pollution that is damaging our future here in the state."[57] This appears to be a direct reference to Ecology's denial of MBT Longview's requested CWA section 401 certification.

171.    During the same October 2017 discussion, Defendant Inslee specifically referenced the proposed Terminal as a project that could not meet Washington's rigorous environmental standards in order to receive permits.[58] In another apparent reference to the Terminal, he warned against building "an infrastructure that locks us into a fossil fuel."[59]

172.    MBT Longview's CWA section 401 certification request was not treated like other requests of its kind. It was denied because the Defendants oppose coal exports and construction of a coal export facility at the Terminal.

**K.      Washington State's refusal to permit improvements to the Terminal**

---

[56] WA Governor's Office, *Inslee Visits Colleges to Urge Climate Action*, MEDIUM (Oct. 25, 2017), https://medium.com/wagovernor/inslee-visits-colleges-to-urge-climate-action-5a5b385fd290.

[57] *See Governor Inslee Climate Change Town Hall*, *supra* note 30.

[58] *Id.*; *see also* Emily Boerger, *Gov. Inslee Encourages Action and Innovation at Climate Town Hall*, WASH. STATE WIRE (Oct. 26, 2017), https://washingtonstatewire.com/gov-inslee-encourages-action-innovation-climate-town-hall/.

[59] *Governor Inslee Climate Change Town Hall*, *supra* note 30. Similarly, at a Climate Change Town Hall at Bellevue College, Defendant Inslee noted that he doesn't want Washington to "lock [it]self into infrastructure that is going to be there 50 years that will essentially expand fossil fuel and lock you into that. We do not want to get into that mindset or make those kinds of decisions." 350 Seattle, *supra* note 29.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 35 OF 53
(                                )
[4822-5378-3084]

LAW OFFICES
**GORDON THOMAS HONEYWELL LLP**
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

173.    In August 2017, the current lessee of the Millennium Bulk Terminal, Northwest Alloys, sought DNR's consent under the lease to make certain improvements to the existing terminal.

174.    The proposed improvements to the terminal were part of MBT Longview's plan to construct a coal export facility, but they did not exempt MBT Longview from any permitting or approval requirements.

175.    Because the lease already allows transloading of coal and the coal export facility would still be subject to numerous federal and state environmental review and permitting requirements, DNR approval should have been straightforward and consistent with the 60 days allowed for such review under the lease.

176.    Nonetheless, on October 24, 2017, Defendant Franz sent a lengthy legal memorandum to the lessee explaining that DNR had determined the proposed improvements were not "in the best interests of the State." A copy of that memorandum is filed with this Complaint as **Exhibit B**.

177.    Defendant Franz's memorandum rejecting the proposed lease improvements adopts Ecology's rationale for denying MBT Longview's request for CWA section 401 certification, including Ecology's reliance on the environmental effects of rail transportation.

178.    Despite having executed a lease that expressly allows a coal export facility at the site, DNR did not treat the request to make improvements to the Terminal like other similar requests. It refused to consent to the proposed improvements because Defendant Franz and the other Defendants do not support construction of a coal export facility at the Terminal.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 36 OF 53
(                                    )
[4822-5378-3084]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**L.    Defendants' actions lead to the denial of the shoreline permit**

179.    As part of its proposal to construct a coal export facility at the Terminal, MBT Longview applied for a Shoreline Substantial Development Permit and a Shoreline Conditional Use Permit from Cowlitz County. In November 2017, the permits came before a Cowlitz County Hearing Examiner for review.

180.    The Cowlitz County staff who reviewed MBT Longview's proposal found that it was consistent with all requirements of the county's Shoreline Master Plan and with the Shoreline Management Act and recommended that the permits be approved.

181.    Despite Cowlitz County's recommendation, the Hearing Examiner explicitly relied on Ecology's EIS, as well as the findings that Ecology made in connection with its CWA section 401 decision, to deny the permits. A copy of that decision is filed with this Complaint as **Exhibit C**.

182.    The Hearing Examiner further observed that DNR's refusal to authorize improvements related to MBT Longview's proposal made it "likely" that DNR would also deny future permits.

183.    Despite the fact that the Cowlitz County staff recommended granting the permits requested by MBT Longview, the Hearing Examiner relied on the prior decisions of the Defendants to block MBT Longview's proposed coal export terminal. Those prior decisions were motivated by the Defendants' opposition to coal exports, and were not based in law or consistent with the facts of the case.

**M.    Defendants have no intention of ever approving the Terminal**

184.    It is well established that the Defendants oppose coal and coal exports on policy grounds. Their actions in denying the proposed sublease, the CWA section 401

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

certification, and the proposed lease improvements demonstrate that they have no intention of allowing the Terminal to be constructed.

185.     On October 23, 2017, Ecology sent a letter to MBT Longview that makes the state's position on the proposed Terminal crystal clear. A copy of that letter is filed with this Complaint as **Exhibit D**.

186.     In that letter, Ecology stated that the same potential environmental effects on which it relied to deny MBT Longview's request for CWA section 401 water quality certification "likely preclude Ecology from approving" any of MBT Longview's other permit applications.

187.     Ecology's letter also bluntly stated that its "staff will not be spending time on permit preparation" related to those applications.

188.     The letter, which was signed by Defendant Bellon, referred any questions MBT Longview might have to the Washington Attorney General's Office.

189.     Defendants, in their capacity as Washington public officials, are using the state's regulatory approval authority to set economic and foreign policy for the United States as a whole.

190.     Any bulk commodity shipped by train would have many of the same in-state environmental effects as coal. If the environmental review processes and regulatory standards that Defendants have applied to the proposed coal export facility at the Terminal were applied more broadly, it would have a chilling effect on virtually all interstate and foreign commerce.

191.     The SEPA EIS concludes that the project can meet all state and federal environmental standards. But because they believe that coal exports should not be

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 38 OF 53
(                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

permitted, the Defendants are blocking both foreign and interstate commerce by not approving—or even processing—the permits for the Millennium Bulk Terminal.

## V.   LEGAL AND REGULATORY BACKGROUND

### A.   Federal support for coal and coal exports

192.   The United States government has long supported coal mining and coal export to other countries.

193.   Twenty-five years ago, Congress directed the Secretary of Commerce to prepare "a plan for expanding exports of coal mined in the United States."[60]

194.   Between 2002 and 2012, total U.S. coal exports grew from 39.6 million short tons to 125.7 million short tons.[61]

195.   The current administration continues to pursue a policy of "export[ing] American energy all over the world," including into Asian markets.[62]

196.   On March 29, 2017, Secretary of Interior Ryan Zinke published Secretary's Order 3348, which lifted a moratorium on the federal coal leasing program that had been put in place by the prior administration.

197.   Secretary's Order 3348 directed the Bureau of Land Management to process coal lease applications and modifications expeditiously. Much of the coal that will be mined under these leases and modifications is intended for export to Asia.

---

[60] 42 U.S.C. § 13367(a).

[61] *Coal Data Browser*, U.S. ENERGY INFO. ADMIN., https://www.eia.gov/beta/coal/data/browser/#/topic/41?agg=2,1,0&rank=ok&linechart=COAL.EXPORT _QTY.TOT-TOT-TOT.A&columnchart=COAL.EXPORT_QTY.TOT-TOT-TOT.A&map=COAL.EXPORT_QTY.TOT-TOT-TOT.A&freq=A&ctype=map&ltype=pin&rtype=s&pin=&rse=0&maptype=0 (last visited Dec. 20, 2017).

[62] Office of the Press Secretary, *Remarks by President Trump at the Unleashing America Energy Event*, THE WHITE HOUSE (June 29, 2017, 3:31 PM), https://www.whitehouse.gov/the-press-office/2017/06/29/remarks-president-trump-unleashing-american-energy-event.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 39 OF 53
(                              )
[4822-5378-3084]

198.   Secretary Zinke issued a statement accompanying Order 3348 in which he explained that "it is better to develop our energy here under reasonable regulations and export it to our allies . . . . [A]chieving American energy independence will strengthen our national security by reducing our reliance on foreign oil and allowing us to assist our allies with their energy needs."

199.   Approximately one quarter of all existing United States coal exports are shipped to South Korea, Japan, China, and India.[63] And demand for coal in Asian markets is continuing to increase.[64]

200.   Japan, for example, is "highly interested in importing coal from the United States" to stabilize and secure its energy supplies.[65]

201.   The United States recently launched a "U.S.-Japan Economic Dialogue," aimed at, among other things, "deepen[ing] energy ties."[66]

202.   The United States also recently forged an agreement with the Government of Ukraine that facilitates purchase of American coal. In connection with that agreement, Secretary of Energy Rick Perry issued a statement indicating that the U.S. "looks forward to making available even more of our abundant natural resources

---

[63]*25% of U.S. Coal Exports go to Asia, but Remain a Small Share of Asia's Total Coal Imports*, U.S. ENERGY INFO. ADMIN. (June 21, 2013), https://www.eia.gov/todayinenergy/detail.php?id=11791.

[64]*Southeast Asia's Coal Demand Boom*, INST. FOR ENERGY RESEARCH (Nov. 6, 2017), https://instituteforenergyresearch.org/analysis/southeast-asias-coal-demand-boom/.

[65] Shozo Kaneko, *The Coal-Terminal Debate: A View from Japan*, THE SEATTLE TIMES (Sept. 19, 2017, 1:43 PM), https://www.seattletimes.com/opinion/the-coal-terminal-debate-a-view-from-japan/.

[66] Press Release, Office of the Vice President, Joint Press Release from Vice President Mike Pence and Deputy Prime Minister Taro Aso on the Second Round of U.S.-Japan Economic Dialogue (Oct. 16, 2017), https://www.whitehouse.gov/the-press-office/2017/10/16/joint-press-release-vice-president-mike-pence-and-deputy-prime-minister; *see also* Roberta Rampton & Minami Funakoshi, *Pence Kicks Off Japan Talks, Both Sides Seek 'Near Term' Results*, REUTERS (April 17, 2017, 2:05 PM), https://www.reuters.com/article/us-pence-asia-japan/pence-kicks-off-japan-talks-both-sides-seek-near-term-results-idUSKBN17J1GI.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 40 OF 53
(                              )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  ·  FACSIMILE (253) 620-6565

to allies and partners like Ukraine in the future to promote their own energy security through diversity of supply and source."[67]

203.    Secretary of Commerce Wilbur Ross also issued a statement in connection with the agreement to supply coal to the Ukraine. There, he emphasized that he "look[s] forward to working with Secretary Perry and others in industry and government to further expand American exports in support of our goals of keeping this country safe and promoting robust economic growth."

204.    In December 2017, the White House released its updated National Security Strategy. Its discussion of energy issues includes "Promote Exports" in a list of "Priority Actions."[68]

205.    The National Security Strategy further explains that "[t]he United States will promote exports of our energy resources," including by "expand[ing] our export capacity through the continued support of private sector development of coastal terminals . . . ."[69]

**B.    The dormant commerce clause**

206.    The U.S. Constitution's commerce clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

_____

[67] Dept. of Energy, *Secretary Perry and Secretary Ross Hail New Coal Deal with Ukraine*, ENERGY.GOV (JULY 31, 2017), https://energy.gov/articles/secretary-perry-and-secretary-ross-hail-new-coal-deal-ukraine.

[68] WHITE HOUSE, NATIONAL SECURITY STRATEGY FOR THE UNITED STATES OF AMERICA at 23 (Dec. 2017), https://www.whitehouse.gov/wp-content/uploads/2017/12/NSS-Final-12-18-2017-0905.pdf.

[69] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 41 OF 53

(                                    )

[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

207.    Though the commerce clause only explicitly mentions Congress' affirmative power to regulate commerce, federal courts have long read into it a "dormant" or negative limitation that also constrains the states' power to regulate foreign and interstate commerce.

208.    States violate the dormant commerce clause if their actions discriminate against or unduly burden foreign or interstate commerce.

209.    More specifically, state regulation runs afoul of the foreign commerce clause if it (1) creates a substantial risk of conflicts with foreign governments; or, (2) undermines the ability of the federal government to speak with "one voice" concerning foreign commercial affairs.

210.    Dormant interstate commerce clause claims are analyzed using a two-tier framework: If an action is facially discriminatory, either in purpose or "practical effect," it is unconstitutional unless it serves a legitimate local purpose that could not be served by available nondiscriminatory means. Nondiscriminatory actions, on the other hand, are unconstitutional when the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.

C.    **General Agreement on Tariffs and Trade**

211.    The United States has been a party to the General Agreement on Tariffs and Trade (GATT) since January 1, 1948, and a member of the World Trade Organization (WTO) since January 1, 1995.

212.    Article XI:1 of the GATT provides "[n]o prohibition or restrictions other than duties, taxes or other charges, whether made effective through quotas, import or export licenses or other measures, shall be instituted or maintained by any contracting

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

party . . . on the exportation or sale for export of any product destined for the territory of any other contracting party."

213.    Article XI:2 provides a number of exceptions to this general rule, including "[e]xport prohibitions or restrictions temporarily applied to prevent or relieve critical shortages of foodstuffs or other products essential to the exporting contracting party" and "export prohibition or restrictions necessary to the application of standards or regulations for the classification, grading or marketing of commodities in international trade."

214.    Article XX of the GATT provides certain additional exceptions to the requirements of Article XI, provided that the measure in question is not "a disguised restriction on international trade."

215.    In the past, the United States has relied on GATT Article XI:1 to protect its commercial interests. For instance, in a recent case, the United States successfully challenged Chinese export restrictions on rare earths, tungsten, and molybdenum.

**D.    ICC Termination Act**

216.    Congress and the courts long have recognized a need to regulate railroad operations at the federal level. Today that regulation is performed pursuant to the ICC Termination Act (ICCTA),[70] which created the Surface Transportation Board and gave it complete jurisdiction, to the exclusion of the states, over the regulation of railroad operations.

---

[70] 49 U.S.C. §§ 10101, *et seq.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 43 OF 53
(                                      )
[4822-5378-3084]

217.    ICCTA further provides that "remedies . . . with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."[71]

218.    Any form of state or local permitting or preclearance that, by its nature, could be used to deny, or place conditions on, a railroad's ability to conduct some part of its operations is "categorically" preempted by ICCTA.

219.    Even when state actions are not categorically preempted, they are still preempted if they may reasonably be said to have the effect of managing or governing rail transportation.

E.      **Ports and Waterways Safety Act**

220.    The Ports and Waterways Safety Act (PWSA)[72] regulates the operation of marine tanker vessels in U.S. harbors.

221.    In enacting the PWSA, Congress intended to provide for sole federal regulation of national and international maritime commerce.

222.    The PWSA accordingly preempts state and local laws that are inconsistent with the federal statutory structure.

223.    Where state actions bear on national and international commerce, there is no threshold assumption that concurrent regulation by the State is a valid exercise of its police power.

/ / /

/ / /

———————————————

[71] 49 U.S.C. § 10501(b).

[72] 33 U.S.C. §§ 1221, *et seq*.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 44 OF 53
(                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

# VI.    CLAIMS FOR RELIEF

**Count I – Dormant Foreign Commerce Clause**

224.    Plaintiffs incorporate and re-allege the foregoing paragraphs.

225.    By unreasonably denying and refusing to process permits for the Millennium Bulk Terminal, the Defendants have discriminated against Lighthouse's and its subsidiaries' efforts to export coal to their Asian customers, in violation of the dormant foreign commerce clause.

226.    By expanding the scope of their SEPA review beyond the boundaries of Washington State, and especially by including the environmental effects of coal exports to foreign nations, the Defendants have further discriminated against Lighthouse's and its subsidiaries' efforts to export coal to their Asian customers, in violation of the dormant foreign commerce clause.

227.    The Defendants' actions have created a substantial risk of conflict with foreign governments, which rely on American coal exports for power production.

228.    In addition, the federal government has made it clear that the policy of the United States is to favor the expansion of coal exports to foreign countries, including countries in Asia.

229.    By taking actions and refusing to act in ways consistent with the federal government's coal export policies, the Defendants have severely undermined the ability of the United States to speak with one voice in foreign commercial affairs and to implement its National Security Strategy.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

230.    By unilaterally imposing an embargo on new coal exports, the Defendants are interfering with Washington's sister states'—including Wyoming and Montana—ability to engage in foreign commerce.

231.    By expanding the scope of their SEPA review beyond the boundaries of Washington State, and especially by including the environmental effects of coal shipments destined for foreign nations, the Defendants have further discriminated against Lighthouse's and its subsidiaries' efforts to engage in foreign commerce.

232.    By concluding that potential environmental effects cannot be mitigated under SEPA if those effects are within the jurisdiction of the federal government, the Defendants are unduly burdening, and in effect regulating, foreign commerce.

233.    Defendants' refusal to license a coal export facility is prohibited under the United States' obligations as a member of the WTO, as it constitutes a prohibition or restriction on exportation under GATT Article XI:1; is not covered by any of the exceptions set out in GATT Articles X1:2 or XX; and, in any case, is a "disguised restriction on international trade."

234.    In addition, Defendants' actions could be cited and leveraged by respondents in WTO disputes involving export restrictions brought by the United States, and may interfere with the ability of the United States to compel other nations through the WTO dispute settlement process and other available bilateral, regional, and multilateral mechanisms to reduce or remove export restrictions that impair the foreign commerce of the United States.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

235.    The Defendants' actions also injure Lighthouse and its subsidiaries by impacting the willingness of the private sector to invest in the development of coal export facilities in the state of Washington, and along the entire Pacific Coast.

236.    Defendants' actions have injured Lighthouse and its subsidiaries directly and have created a disincentive to build or expand other coal export facilities, which will negatively impact U.S. economic growth, job creation, and exports.

237.    Defendants' actions amount to an embargo or quota on American coal exports to Asia, in violation of the dormant foreign commerce clause.

238.    On information and belief, the Defendants' true reason for denying the Plaintiffs' permit applications is the desire to prevent American coal export to Asia.

239.    In all of these ways, the Defendants in their capacity as public officials of the state of Washington have violated the dormant foreign commerce clause and 42 U.S.C. § 1983.

**Count II – Dormant Interstate Commerce Clause**

240.    Plaintiffs incorporate and re-allege the foregoing paragraphs.

241.    By unreasonably denying and refusing to process permits for the Millennium Bulk Terminal, the Defendants have discriminated against Lighthouse's and its subsidiaries' efforts to transport into Washington coal that is being mined in Montana, Wyoming, and other states in violation of the dormant interstate commerce clause.

242.    By expanding the scope of their SEPA review beyond the boundaries of Washington State, and especially by including the environmental effects of coal shipments being transported from other states, the Defendants have further

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 47 OF 53
(                                                    )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

discriminated against Lighthouse's and its subsidiaries' efforts to transport into Washington coal that is being mined in Montana and Wyoming.

243.    By concluding that potential environmental effects cannot be mitigated under SEPA if those effects are within the jurisdiction of the federal government, the Defendants are unduly burdening, and in effect regulating, interstate commerce.

244.    Defendants' actions and inactions with respect to the Millennium Bulk Terminal discriminate against interstate commerce in both purpose and practical effect, and they serve no legitimate local purpose that could not be served by nondiscriminatory means.

245.    Defendants' actions and inactions with respect to the Millennium Bulk Terminal have also imposed a burden on interstate commerce that is clearly excessive in relation to its putative local benefits.

246.    Defendants' actions also injure Lighthouse and its subsidiaries by impacting the willingness of the private sector to invest in the development of coal export facilities in the state of Washington, and along the entire Pacific Coast.

247.    Defendants' actions have injured Lighthouse and its subsidiaries directly and have created a disincentive to build or expand other coal export facilities, which will negatively impact U.S. economic growth, job creation, and exports.

248.    In all of these ways, the Defendants in their capacity as public officials of the state of Washington have violated the dormant interstate commerce clause and 42 U.S.C. § 1983.

**Count III – ICCTA Preemption**

249.    Plaintiffs incorporate and re-allege the foregoing paragraphs.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 48 OF 53
(                                   )
[4822-5378-3084]

250.     Lighthouse, LHR Coal and its subsidiaries, and LHP are all rail customers who have a right to common carrier rail service under ICCTA.

251.     Defendants' actions and inactions with respect to the Millennium Bulk Terminal are forms of permitting or preclearance that are being used to deny or condition rail carriers' ability to provide common carrier service to Lighthouse and its subsidiaries.

252.     Defendants' actions and inactions with respect to the Millennium Bulk Terminal have the effect of managing or governing rail transportation, including the common carrier service requested by Lighthouse's subsidiaries.

253.     Defendants' conclusion that potential environmental effects cannot be mitigated under SEPA if those effects are within the jurisdiction of the federal government, and their actions in denying permits and approvals on that basis, have the effect of managing or governing rail transportation, including the common carrier service requested by Lighthouse's subsidiaries.

254.     Defendants' actions also injure Lighthouse and its subsidiaries by impacting the willingness of the private sector to invest in the development of coal export facilities in the state of Washington, and along the entire Pacific Coast.

255.     Defendants' actions have injured Lighthouse and its subsidiaries directly and have created a disincentive to build or expand other coal export facilities, which will negatively impact the investment-backed expectations of Lighthouse investors specifically, as well as U.S. economic growth, job creation, and exports generally.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

256.    For all these reasons, Defendants' actions in their capacity as public officials of the state of Washington are preempted by ICCTA and violate Lighthouse's and its subsidiaries' rights to receive common carrier service under 42 U.S.C. § 1983.

**Count IV – PWSA Preemption**

257.    Plaintiffs incorporate and re-allege the foregoing paragraphs.

258.    Lighthouse, LHR Coal and its subsidiaries, and LHP all have a right to receive vessel service as a means of exporting coal to their Asian customers.

259.    The PWSA preempts state laws that attempt to regulate the operation of vessels in U.S. harbors, including the vessels that would provide service to Lighthouse and its subsidiaries at the proposed Millennium Bulk Terminal coal export facility.

260.    By concluding that potential environmental effects cannot be mitigated under SEPA if those effects are within the jurisdiction of the federal government, the Defendants are in effect regulating the operation of vessels in U.S. harbors, including the vessels that would provide service to Lighthouse and its subsidiaries at the proposed Millennium Bulk Terminal coal export facility.

261.    Defendants in their capacity as public officials of the state of Washington have acted to prevent vessels from serving the Terminal, including by relying on the effects of vessel traffic as one reason for the denial of MBT Longview's request for CWA section 401 certification.

262.    Defendants' actions also injure Lighthouse and its subsidiaries by impacting the willingness of the private sector to invest in the development of coal export facilities in the state of Washington, and along the entire Pacific Coast.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

263.    Defendants' actions have injured Lighthouse and its subsidiaries directly and have created a disincentive to build or expand other coal export facilities, which will negatively impact U.S. economic growth, job creation, and exports.

264.    For all these reasons, Defendants' actions in their capacity as public officials of the state of Washington are preempted by the PWSA and violate Lighthouse's and its subsidiaries' rights to receive vessel service under 42 U.S.C. § 1983.

## VII.    PRAYER FOR RELIEF

Wherefore, the Plaintiffs respectfully request the following relief:

A.    A declaration that Defendants' denial of MBT Longview's requested sublease for the Millennium Bulk Terminal was an unconstitutional violation of the dormant commerce clause.

B.    A declaration that Defendants' denial of MBT Longview's requested CWA section 401 certification was an unconstitutional violation of the dormant commerce clause.

C.    A declaration that Defendants' denial of MBT Longview's requested CWA section 401 certification was preempted by ICCTA and the PWSA.

D.    A declaration that any environmental reviews of the proposed coal export facility at the Millennium Bulk Terminal—or any future coal export terminal that Lighthouse or its subsidiaries propose—may not be used to deny or unreasonably condition a permit beyond the standards applied to other non-coal terminal projects, including denying or unreasonably conditioning a permit based on the effects of transporting coal to and from the Terminal by rail and vessel traffic in interstate or foreign commerce.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 51 OF 53
(                                              )
[4822-5378-3084]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

E.      A declaration that potential environmental effects within the jurisdiction of the federal government cannot be the basis of a conclusion that the environmental effects of the Millennium Bulk Terminal—or any future coal export terminal that Lighthouse or its subsidiaries propose—project are unmitigable.

F.      A declaration that any decision by any state or local entity relying on the Defendants' denial of the sublease or the Defendants' denial of the CWA section 401 certification, including the denial of MBT Longview's requested shoreline permit, is an unconstitutional violation of the dormant commerce clause and/or is preempted by ICCTA and the PWSA.

G.      An order vacating any and all of the Defendants' unconstitutional and illegal decisions regarding the Millennium Bulk Terminal, as well as any federal, state, or local decisions relying on Defendants' unconstitutional or illegal actions.

H.      An injunction ordering the Defendants to apply the same review standards to the Millennium Bulk Terminal—or any future coal export terminal that Lighthouse or its subsidiaries propose—that are applied to other non-coal terminal proposals.

I.      An injunction ordering the Defendants not to deny MBT Longview's requested CWA section 401 certification or any other permit or approval for the Millennium Bulk Terminal on the basis of rail or vessel traffic, or any other potential environmental effects within the jurisdiction of the United States.

J.      An injunction ordering the Defendants to continue processing any and all current and future MBT Longview permit applications.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 52 OF 53
(                                        )
[4822-5378-3084]

K.      An order awarding plaintiffs their costs of litigation, including attorneys'
fees and expert witness fees, including those awardable under 42 U.S.C. § 1988.

L.      Such other relief as the court deems just and proper.

Dated this 3rd day of January, 2018 at Tacoma, Pierce County, Washington.

GORDON THOMAS HONEYWELL, LLP

By: s/Bradley B. Jones
       Bradley B. Jones, WSBA No. 17197
       bjones@gth-law.com
       1201 Pacific Ave, Ste 2100
       Tacoma, WA  98402
       (253) 620-6500

VENABLE LLP

By: s/Jay C. Johnson
       Jay C. Johnson, VA Bar No. 47009
       jcjohnson@venable.com
       (*pro hac vice* application forthcoming)

By: s/Kathryn K. Floyd
       Kathryn K. Floyd, DC Bar No. 411027
       (*pro hac vice* application forthcoming)
       kkfloyd@venable.com
       600 Massachusetts Ave NW
       Washington DC 20001
       202-344-4000

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565