# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

LIGHTHOUSE RESOURCES, INC. et al.,

    Plaintiffs,

BNSF RAILWAY COMPANY

    Plaintiff-Intervenor

v.

JAY INSLEE,

    Defendants,

WASHINGTON ENVIRONMENTAL COUNCIL, et al.,

    Defendant-Intervenors.

CASE NO. 3:18-CV-05005-RJB

ORDER ON DEFENDANT-INTERVENORS' MOTION FOR PROTECTIVE ORDER

THIS MATTER comes before the Court on a Motion for Protective Order filed by Defendant-Intervenor Washington Environmental Council *et al* ("WEC"). Dkt. 123. The Court

has reviewed the motion, the Response filed by Plaintiffs Lighthouse Resources, Inc. *et al*. ("Lighthouse"), WEC's Reply, and the remainder of the file herein.

## I. BACKGROUND

**A. Procedural History.**

This case arises out of Lighthouse's effort to develop a coal export terminal in Longview, Washington, which, Lighthouse alleges, has been thwarted by Defendants Jay Inslee, Governor to the State of Washington, Maia Bellon, Director of the Washington Department of Ecology, and Hillary Franz, Commissioner of Public Lands (collectively, "the State"). Dkt. 1 at ¶¶5, 16. After Lighthouse filed this action, BNSF Railway Company and WEC filed motions to intervene on behalf of Plaintiffs and Defendants, respectively, and the Court granted both motions. Dkts. 22, 24, 47, 48. WEC is a self-described "coalition of public-interest organizations opposed to the [coal] terminal due to its adverse impacts to human health and environment." Dkt. 123 at 5. The Court also granted five sets of amici curiae leave to file briefs. Dkts. 60, 110.

**B. Complaint.**

The following facts alleged in the Complaint are assumed for purposes of this motion. Lighthouse is a coal energy supply chain company that manages coal mining, transfer by rail and ocean-going vessels, and sale to end users, both domestic and abroad. Dkt. 1 at ¶¶5, 16, 36. Lighthouse presently ships coal from the United States out of an export terminal in Canada, which has increased shipping costs and constrains Lighthouse's ability to fulfill contractual terms and meet increasing market demand. *Id*. at ¶¶48-50. Lighthouse has worked to identify, contract with, and/or develop a new coal export facility since 2009, and it has identified the Millennium Bulk Terminal (MBT) in Longview, Washington, as its preferred West Coast site. *Id*. at ¶¶52, 54.

Starting in 2012, Lighthouse began the permitting process for the proposed coal export facility at MBT, which has involved approximately two dozen federal and state plans, permits, and approvals. Dkt. 1 at ¶70. Under the façade of official State policy, by means of administrative decisions (collectively, "State administrative decisions"), the State has effectively "blocked" development of the MBT Project. *Id*. at ¶¶63, 130, 155, 161, 163, 181. *See also*, Dkt. 1-1(§ 401 CWA certification), Dkt. 1-2 (DNR denial of sublease), Dkt. 1-3(Cowlitz County Shoreline Permit Application denied based on EIS). The State has coordinated with Oregon and California in blocking the MBT Project. *Id*. at ¶¶99-116. All three named defendants have publicly expressed personal opposition to exporting coal. *Id*. at ¶¶80-98.

The Complaint alleges four claims, violations of: the dormant foreign commerce clause, Count I; the dormant interstate commerce clause, Count II; the Interstate Commerce Commission Termination Act (ICCTA), Count III; and the Ports and Waterways Safety Act (PWSA), Count IV. Dkt. 1 at ¶¶ 224-264. Lighthouse has raised all claims under 28 U.S.C. §1983 and seeks declaratory and injunctive relief, as well as costs and fees. *Id*. at pp. 51, 52.

C. <u>WEC's Motion for Protective Order.</u>

WEC seeks a protective order to preclude the need to respond to Request for Production No. 1, which seeks "[a]ll documents that relate to WEC <u>strategies, campaigns, plans, or policies</u> regarding the [MBT] Project including but not limited communications with the Governor's Office, the Washington Department of Ecology, the Washington State Department of Natural Resources, any other state or federal agency, <u>or any other non-governmental organization</u> regarding the [MBT] Project." Dkt. 123-3 at 13 (emphasis added). *See also*, *id*. at 11 (Interrogatory No. 6: "Identify all WEC strategy documents, position or policy papers, lobbying efforts, letters, documents, communications, and/or other attempts to lobby, influence, or

persuade"). WEC and Lighthouse both construe the discovery request as encompassing both external documents, e.g., documents exchanged and communications between WEC and the State, and internal documents, e.g., documents exchanged and communications among the various WEC organizations. WEC has agreed to produce external documents, but seeks protection from producing internal documents. *Id*. at 6, 8.

WEC objects to the discovery request as irrelevant, privileged under the First Amendment, and unduly burdensome. Dkt. 123. In support of its motion, WEC has submitted the declaration of Cesia Kearns, a former Co-Director of the Power Past Coal Campaign (PPCC), a coalition of non-profit organizations that has lobbied against the MBT Project. Dkt. 123-1 at ¶4. According to Kearns, the campaign formed in approximately 2010 and continues to operate. *Id*. at ¶5. The campaign has involved approximately one-hundred non-profit organizations, Kearns states, and at its peak may have involved as many as thirty-three (33) full time employees. *Id*. Kearns maintains that there have been "countless emails exchanged both internally and externally among various campaign staff[,]" and that turning over internal WEC strategy documents "would have a deeply chilling effect on [the campaign's] ability to function" and would "inhibit [] our ability to work together" by "reduc[ing] the willingness of some members to participate" with member organizations. *Id*. at ¶¶8, 9. Also submitted by WEC is the declaration of an IT Manager for one of the five intervenor-defendant organizations. An initial search for "potentially relevant" emails yielded approximately180,000 results. Dkt. 126-1.

Lighthouse defends its discovery request by pointing to correspondence among State employees showing coordination with campaigners. An email from the Department of Ecology's Director of Communications to Governor Inslee's Chief of Staff and Director of Policy asks to "talk for a moment offline" about an appearance by Director Bellon (Ecology) at a non-coal

event hosted by Millennium. Dkt. 125-1 at 2. Lighthouse also relies on correspondence between the PPCC and the State. For example, WEC emailed the Department of Ecology a Memorandum "for our 2pm call," and another PPCC member emailed the Department of Natural Resources "some additional thoughts on the sublease" in a memorandum form, "[p]er our conversation last week[.]" *Id*. at 4, 6. In a speech outline for a speech by Director Bellon at a WEC gala, reference is made to WEC as her "left flank" and as an organization that is "unbelievably coordinated with [the] Governor's Office and Ecology." *Id*. at 26-34.

## II. FED. R. CIV. P. 26 STANDARD FOR PROTECTIVE RELIEF AND FIRST AMENDMENT PRIVILEGE

Parties may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[,]" in light of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Parties may seek relief from discovery requests in the form of a protective order after satisfying meet and confer requirements. "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). The party seeking protection bears the burden to show what specific prejudice or harm will behalf the party absent protective relief. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.d 1206, 1210-11 (9th Cir. 2002). Courts are afforded broad discretion to control when and how protective orders should be issued. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

Parties seeking protective relief and objecting to discovery on First Amendment grounds are "in essence asserting a First Amendment *privilege*." *Perry v. Schwarzenegger*, 591 F.3d

ORDER ON DEFENDANT-INTERVENORS' MOTION FOR PROTECTIVE ORDER - 5

1126, 1140 (9th Cir. 2009). "In this circuit, a claim of First Amendment privilege is subject to a two-part framework[,]" where: (1) the party invoking the privilege must make a prima facie showing of arguable First Amendment infringement, and (2) the court "balances the burdens imposed on individuals and associations against the significance of the . . . interest in disclosure." *Id*.

## III. DISCUSSION

As a threshold matter, the Court notes that the parties have met their meet and confer obligation, which is not dispute.

The scope of this Discussion pertains to internal documents only, because WEC has agreed to produce external documents. Dkt. 123 at 6, 8. Each of WEC's three reasons for seeking protective relief from producing internal documents are herein considered: lack of relevance, privilege under the First Amendment, and undue burden.

**A. Lack of Relevance.**

WEC argues that internal documents are not remotely relevant to Lighthouse's claims. Dkt. 123 at 6-9; Dkt. 126 at 2-5. To prevail on the foreign or domestic dormant commerce clause claims, WEC explains, Lighthouse must show discrimination, i.e., "economic protectionism," or a clearly excessive burden on commerce in relation to the putative local benefits. *Id*. at 7. WEC acknowledges that it "openly advocated" for certain State administrative decisions, not unlike Lighthouse, but this is "how advocacy works on issues of public concern[,]" WEC opines. *Id*. at 7; *id*. at 4. The focus of discovery should be on the State's administrative decisions and on state agents, not on WEC's internal strategies and communications, WEC argues. *Id*. Even if Lighthouse could establish that WEC coordinated with the State for its administrative decisions, WEC continues, the State's intent is not relevant to commerce clause analysis, and to the extent

it could be relevant, such discovery can and should be sought directly from the defendants, not from WEC. *Id*. at 8, 9; *id*. at 2-5.

Lighthouse argues that the discovery requested is relevant to show the State's discriminatory purpose for its dormant commerce clause claims. Dkt. 124 at 4-7. According to Lighthouse, WEC's internal communications and strategy documents may reveal the State's animus towards coal and how WEC influenced the State to reach certain outcomes in its administrative decisions, which were issued pretextually. *Id*. Lighthouse points to the speech outline for a speech by Director Bellon at a WEC gala, where she described WEC as her "left flank" and "unbelievably coordinated with [the] Governor's Office and Ecology." *Id*. at 6. *See* Dkt. 125-1 at 26-34. Further, Lighthouse contends, emails referring to meetings between WEC and the State, as well as memorandums and other guidance to the State, show coordination between WEC and the State "behind closed doors." *Id*. at 7, 8.

Lighthouse has met its burden to show relevance of internal documents, which is a low threshold. The record, if construed in Lighthouse's favor and in view of its theory, points to shared animus of WEC and the State towards coal and its export from the State of Washington and the United States, as well as coordinated strategizing and coordinated efforts by WEC and the State to block the MBT Project. Internal documents, if produced, could further support this theory.

WEC's argument that the discovery should be obtained from the State, not WEC, goes not to relevancy but to the weight of the relevancy, which has bearing on the First Amendment issue. *See below*.

Granting protective relief for lack of relevance is not warranted. WEC's motion should be denied on this issue.

**B. First Amendment Privilege.**

   *1. Prima facie showing.*

Under *Perry*, at step one, a prima facie showing is sufficient where enforcement of discovery requests "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, members' associational rights." *Perry*, 591 F.3d at 1140.

WEC argues that its internal documents fall under First Amendment protections for freedom of association. WEC points to the declaration of Cesia Kearns, former Co-Director of the Power Past Coal Campaign, who states that if campaigners "knew that an adversary could gain access to [their] strategies and conversations, it would severely chill our ability to associate with each other[.]" Dkt. 123 at 14; Dkt. 123-1 at ¶8. Kearns declares that it would "inhibit[] our ability to work together" and would "reduce the willingness of some members to participate" with member organizations. *Id.* at ¶¶8, 9. According to Kearns, at its peak the campaign included as many as thirty-three (33) full time employee equivalents and approximately one-hundred organizations. *Id.* at ¶¶3, 5, 6.

Lighthouse takes a dim view of Kearns' declaration, arguing that Kearns offers nothing more than an "unsubstantiated opinion" that does not go beyond broad allegations and subjective fears. Dkt. 124 at 10. To the extent that WEC fears public exposure from WEC's discovery production of the internal documents, Lighthouse notes, Lighthouse is willing to safeguard the discovery under the terms of the stipulated protective order. *Id.*

WEC has met its prima facie burden. While Kearns has only offered her "opinion," as Lighthouse characterizes it, the opinion is based on Kearns' personal experience of several years as Co-Director to the Power Past Coal Campaign, which coordinated lobbying efforts in

opposition to the MBT Project. Kearns is well-positioned to know how campaigners would react to production of WEC's internal strategies and communications, numbering in the tens of thousands, to Lighthouse, the campaign's adversary. It is not much of a stretch to find, for prima facie purposes, that requiring production of the discovery could have a chilling effect on freedom of association. The MBT Project is still underway and the campaign remains ongoing; requiring production of discovery may chill speech immediately, not just in the future for other possible lobbying targets.

   2. *Balancing under* Perry.

Under *Perry*, at step two, "the party seeking the discovery must show that the information sought is highly relevant" and that the discovery "request [is] carefully tailored to avoid unnecessary interference with protected activities, and the information [is] otherwise unavailable." *Perry*, 591 F.3d at 1141.

First, the Court finds that the internal documents are not *highly* relevant based on the showing made. Lighthouse argues that the discovery is "potentially central to this case," because the discovery could show that WEC and the State are "deeply connected," and it could reveal content of WEC meetings with the State, and the coordinated result thereafter. Dkt. 124 at 12. While Lighthouse has certainly articulated a colorable theory sufficient for general relevancy purposes, *see above*, the discovery request cannot be said to be highly relevant at such a level of generality, especially where discrimination by the State, not WEC, is the central issue raised by the claims. Even if WEC coordinated and strategized with the State, WEC is once-removed from the State and its administrative decisions.

Second, the Court finds that the discovery request is not carefully tailored to avoid unnecessary interference with protected activities. According to Lighthouse, the discovery

request is narrowly tailored because it only seeks documents related to the MBT Project, not other projects. Based on WEC's showing, however, it appears that the campaign's efforts to oppose the MBT Project alone were substantial, and production could include tens of thousands of emails and involve approximately one-hundred organizations spanning approximately eight years. Lighthouse argues that even if its request is too broad, Lighthouse stands ready to negotiate a narrower scope. Dkt. 124 at 12. While that is a reasonable offer, and perhaps formed the reason for WEC agreeing to produce the external documents, Lighthouse may remedy the problem by serving narrower discovery requests.

On the other hand, the risk of interfering with campaigners' associational rights, when opposition to the MBT Project remains ongoing, is unrefuted elsewhere by the record. Lighthouse argues that the risk of interference with associational rights is minimal, especially where Lighthouse is fully willing to allow whatever internal documents are produced to be protected from public exposure under the terms of the stipulated protected order. Although leaning on the stipulated protective order may give WEC cover from public exposure, but it is no answer to WEC's concern that handing over internal documents would give the proverbial fox the keys to the henhouse.

Finally, the Court finds that the information is not "otherwise unavailable" at present. According to Lighthouse, the defendants are savvy to the risk of public disclosure requests, revealed, for example, in the email between the Governor's staff and the Department of Ecology communications director, who requested to talk "offline" about a certain topic. Dkt. 124 at 13. WEC reasons that Lighthouse cannot establish that the information is "otherwise unavailable" because it can seek, and has already sought, discovery from the defendants themselves, and the

discovery Lighthouse must ultimately obtain to prevail can only be obtained from the State, not WEC. Dkt. 126 at 7.

It is premature to tell whether the information is otherwise unavailable, because the defendants have not yet been deposed and the State has not yet responded to Lighthouse's first request for discovery, which was served on July 15, 2018. *See* Dkt. 123-5. Should depositions indicate evasiveness by the State, Lighthouse's showing may improve on this issue, although Lighthouse will still need to overcome any showing that the need for discovery sought outweighs the risk of harm to WEC's constitutionally-protected activities.

In conclusion, therefore, the *Perry* balancing presently favors protective relief in favor of WEC and against Lighthouse. WEC's motion and protective relief should be granted as to production of internal documents, which need not be produced.

**C. Undue Burden.**

WEC argues that Lighthouse's request is unduly burdensome because the amount of material sought is "potential staggering," given that WEC and approximately one-hundred organizations, including dozens of staff, have been advocating against the MBT Project since 2010. Dkt. 123 at 10. WEC represents that an initial search of one of five intervenor organizations' archived emails yielded approximately 180,000 responsive emails, which would need to be reviewed prior to production. Dkt. 126 at 5.

Lighthouse argues that WEC's undue burden claims are "premature at best," because Lighthouse has agreed to negotiate narrowing the scope of its discovery request. Dkt. 124 at 8. Lighthouse is "interested only in documents and communications reflecting [WEC's] strategies to block the [MBT] Project, efforts to influence [the State], and dialogues with or about [the

State]," which, Lighthouse maintains, will thus exclude the "daily back-and-forth" between Power Past Coal campaigners unconnected to the State. *Id*.

Because the protective relief should be granted on First Amendment grounds, the Court does not reach the issue of undue burden. Nonetheless, were the Court to reach the issue, the Court would note defects in both parties' showings (although WEC ultimately has the burden). WEC refers to 180,000 responsive emails, but provides no context for what search terms were used. It is also unclear whether WEC narrowed the search in light of what Lighthouse has proposed in its Response, to limit the discovery request to internal documents referencing "efforts to influence . . . or dialogues with or about [the State]," or whether the search broadly includes all correspondences between organizations opposing the MBT Project from 2010 forward. While Lighthouse's efforts to narrow the scope of its discovery are to be encouraged, the problem is also of its own making. Ultimately the Court would, at this juncture, have incomplete information to tell whether Lighthouse's proposed narrowed scope would alleviate the First Amendment concerns, because the scope is still quite broad. *See discussion above*.

Because it is ultimately WEC's burden to show undue burden, which it has not developed with any specificity, protective relief would not be granted on such grounds.

IV. CONCLUSION

Lighthouse meets the threshold for relevance, given that Lighthouse has shown WEC lobbied the State on several fronts and may share an animus towards coal and its export to other states or countries. However, the request is far too broad to be highly relevant or narrowly tailored to alleviate legitimate fears about chilling WEC's associational rights. At least at this stage of the litigation, WEC should be excused from producing the internal discovery, and to that extent WEC's motion should be granted. This Order is issued without prejudice to Lighthouse

and its future discovery efforts and without prejudice to WEC and any future need for protective relief.

* * *

THEREFORE, it is HEREBY ORDERED:

The Motion for Protective Order filed by Defendant-Intervenor Washington Environmental Council *et al.* (Dkt. 123) is HEREBY GRANTED consistent with this Order. WEC need not produce internal documents, that is, strategies, campaigns, plans, or policies communicated between and among WEC entities and entities other than Defendants. To that extent, Lighthouse's discovery requests are STRICKEN. WEC has already agreed to produce external documents, and WEC shall produce those documents.

This Order is issued without prejudice to either party to seek further discovery relief.

IT IS SO ORDERED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 30th day of July, 2018.

ROBERT J. BRYAN
United States District Judge