1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| 10 | LIGHTHOUSE RESOURCES INC., et al., |
| 11 | Plaintiffs, |
| 12 | and |
| 13 | BNSF RAILWAY COMPANY |
| 14 | Intervenor-Plaintiff, |
| 15 | v. |
| 16 | JAY INSLEE, et al., |
| 17 | Defendants, |
| | and |
| 18 | WASHINGTON ENVIRONMENTAL |
| 19 | COUNCIL, et al., |
| 20 | Intervenor-Defendants. |

CASE NO. 3:18-cv-05005-RJB

ORDER ON DEFENDANTS' AND
INTERVENOR-DEFENDANTS'
MOTIONS FOR PARTIAL
SUMMARY JUDGMENT

21

22

23

24

THIS MATTER comes before the Court on the Defendants Jay Inslee and Maia Bellon's

(collectively the "State") Motion for Summary Judgment on Preemption Issues (Dkt. 129) and

Intervenor-Defendants Washington Environmental Council, Climate Solutions, Friends of the

1  Columbia Gorge, Sierra Club and Columbia Riverkeeper's (collectively "WEC") Motion for

2  Partial Summary Judgment on Preemption Claims (Dkt. 128).  These motions were renoted after

3  Plaintiffs Lighthouse Resources, Inc., Lighthouse Products, LLC, LHR Infrastructure, LLC,

4  LHR Coal LLC, and Millennium Bulk Terminals-Longview, LLC's (collectively "Lighthouse")

5  Fed. R. Civ. P. 56 (d) motion (Dkt. 144) and Intervenor Plaintiff BNSF Railway Company's

6  ("BNSF") Fed. R. Civ. P. 56 (d) motion (Dkt. 146) were granted and the parties were given an

7  opportunity to provide supplemental briefs and materials after discovery.  The Court has

8  considered the motions, briefs and supplemental briefs filed in support of and opposition thereto,

9  including briefs of amici curiae, and the remainder of the file herein.

10  This case originally challenged the State's denial of a Clean Water Act Section 401

11  Certification ("water quality certificate") and a denial of request for approval of a sublease of

12  state-owned aquatic lands for Lighthouse's proposed coal export terminal.  Dkt. 1.

13  As is relevant to the pending motions, Lighthouse and Intervenor-Plaintiff BNSF, who

14  plans to provide rail service to the proposed terminal, maintain that the State's denial of the

15  water quality certificate is preempted by the Interstate Commerce Commission Termination Act

16  ("ICCTA") and Lighthouse further argues that the State's decision is also preempted by the Ports

17  and Waterways Safety Act ("PWSA").  Dkts. 1 and 22-1. Lighthouse and BNSF make other

18  claims in their Complaints that are not the subject of these motions.  *Id*.

19  The State and WEC move for summary dismissal of each of the preemption claims.

20  Dkts. 128 and 129.  Lighthouse and BNSF oppose the motions.  Dkts. 144, 146, 187, and 190.

21  For the reasons provided below, the State and WEC's motion for summary judgment

22  dismissal of Lighthouse's and BNSF's preemption claims should be granted and those claims

23  dismissed.

24

ORDER ON DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY
JUDGMENT - 2

1

## I.   <u>FACTS</u>

2       In order to meet Asian coal demands, Lighthouse, a coal supply chain company, proposes

3 building a new coal export facility at the existing Millennium Bulk Terminal in Longview,

4 Washington on and in the Columbia River.  Dkt. 1.  At full build out, the proposed terminal

5 would be capable of exporting 44 million metric tons of coal a year, and would include three

6 large docks.  *Id.*  The coal would come primarily from the Powder River Basin, in Montana and

7 Wyoming, and the Uinta Basin, in Utah and Colorado.  *Id.*  Lighthouse owns and leases the coal

8 mining rights, operates coal mines, and maintains coal loading infrastructure.  *Id.*  BNSF would

9 provide rail transport for the coal.  *Id.*  The proposed terminal would be operated by Lighthouse.

10 *Id.*  After Lighthouse unloads and stockpiles the coal, it would eventually be loaded onto ocean

11 going vessels at the proposed terminal's docks and shipped to Asia.  *Id.*

12       Lighthouse began the permitting process for the proposed terminal in 2012.  *Id.*  As is

13 relevant to the motions here, on July 18, 2016, Lighthouse submitted an application to the State

14 for a Section 401 water quality certification, which is required under the Clean Water Act, 33

15 U.S.C. §1341.  *Id.*  A Final Environmental Impact Statement ("FEIS") was issued on April 28,

16 2017.  The EIS identified nine environmental resource areas that would suffer unavoidable and

17 significant adverse environmental impacts from the construction and operation of the proposed

18 terminal.  Dkt. 130-1.  Those identified areas were:  social and community resources, cultural

19 resources, tribal resources, rail transportation, rail safety, vehicle transportation, vessel

20 transportation, noise and vibration, and air quality.  Dkt. 130-1, at 43-45.  The FEIS was not

21 appealed.

22       On September 26, 2017, the State denied Lighthouse's application for a water quality

23 certificate on two grounds.  Dkt. 1-1.  The first was that the proposed terminal's "significant

24

1    unavoidable adverse impacts" identified in the FEIS conflicted with the Washington State

2    Environmental Policy Act ("SEPA") policies in WAC 173-802-110.  Dkt. 1-1, at 4-14.  The

3    second basis for the denial was that the State did not have reasonable assurance that the proposed

4    terminal would meet applicable water quality standards.  Dkt. 1-1, at 14-19.  Lighthouse

5    appealed the State's denial to Washington's Pollution Control Hearings Board.  Dkt. 130-6.  On

6    August 15, 2018, the State's decision to deny Lighthouse's water quality certificate was affirmed

7    by that board.  *Id.*

8            In addition to other permits, Lighthouse was also required to get State approval of a

9    sublease (the lease is with Northwest Alloys) of state-owned aquatic lands upon which a portion

10   of the proposed project would be constructed.  Dkt. 1-2.  On January 2, 2017, the State denied

11   the request.  Dkt. 130-2.  The decision provided that the denial was based on the failure to

12   provide requested financial information.  *Id.*  In October 2017, the Cowlitz County Superior

13   Court ruled the decision was "arbitrary and capricious" (Dkt. 1, at 33) but did not require that the

14   sublease be approved.  Northwest Alloys then requested that the State approve improvements to

15   the site is support of the project.  Dkt. 1-2.  On October 24, 2017, the State denied the request

16   without prejudice, noting that the proposed improvements were inconsistent with the lease, there

17   was insufficient information, and that the water quality certificate had been denied (and that

18   certain findings from that denial were "relevant," including findings that "fugitive coal dust and

19   spilled coal from . . . the planned facility and related rail transportation would increase suspended

20   solids in the Columbia River," that "construction activities, including dredging and pile driving,

21   could harm fish resources and affect aquatic habitat," and that Lighthouse "failed to evaluate

22   impacts from wastewater discharge from operations at the planned coal export terminal.")  Dkt.

23   1-2.  The October 24, 2017 decision was not appealed.  The claims asserted in this case based on

24

ORDER ON DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY
JUDGMENT - 4

1    the State's denial of approval of the sublease, were dismissed on October 23, 2018 because

2    consideration of those claims is barred by the Eleventh Amendment.  Dkt. 170.

3              This Order will first address the standard on summary judgment, then turn to the State's

4    motion to summarily dismiss all preemption claims based on Lighthouse and BNSF's inability to

5    show the "redressability" prong and so lack of standing to assert these preemption claims; then

6    turn to the motions for summary judgment by claim:  first, on Lighthouse's ICCTA preemption

7    claim, second, on BNSF's ICCTA preemption claim, and lastly, on Lighthouse's PWSA claim.

## II.    DISCUSSION

### A.  STANDARD ON MOTION FOR SUMMARY JUDGMENT

10             Summary judgment is proper only if the pleadings, the discovery and disclosure materials

11   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

12   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c). The moving party is

13   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

14   showing on an essential element of a claim in the case on which the nonmoving party has the

15   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

16   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

17   for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

18   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

19   metaphysical doubt.").  *See also* Fed. R. Civ. P. 56 (d).  Conversely, a genuine dispute over a

20   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

21   requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

22   *Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

23   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

24

1    The determination of the existence of a material fact is often a close question.  The court

2    must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

3    e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

4    *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

5    of the nonmoving party only when the facts specifically attested by that party contradict facts

6    specifically attested by the moving party.  The nonmoving party may not merely state that it will

7    discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

8    to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

9    Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

10   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

11      B.  **STATE'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF ALL**
          **PREEMPTION CLAIMS BASED ON A FAILURE TO SHOW THE**
12        **REDRESSABILITY PRONG OF STANDING**

13      Article III of the U.S. Constitution confines federal courts to hearing only "cases" or

14   "controversies."  "The core component of standing is an essential and unchanging part of the

15   case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

16   (1992).  The doctrine of standing "ensure[s] that federal courts do not exceed their authority[.]"

17   *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). The "irreducible constitutional minimum of

18   standing consists of three elements[:] [t]he plaintiff must have (1) suffered an injury in fact, (2)

19   that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

20   redressed by a favorable judicial decision." *Id*. (*internal quotations and citations omitted*).

21   "[P]laintiff[s] must demonstrate standing for each claim [they] seek to press."  *DaimlerChrysler*

22   *Corp. v. Cuno,* 547 U.S. 332, 335 (2006).

23

24

1       The State argues that Lighthouse and BNSF do not have standing for their ICCTA

2   preemption claims and that Lighthouse does not have standing for its PWSA preemption claim

3   because they cannot meet the third element of standing – that their injuries are "likely to be

4   redressed by a favorable judicial decision."  Dkts. 129, 150, and 199.

5       Determining redressability "requires an analysis of whether the court has the power to

6   right or to prevent the claimed injury."  *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 899

7   (9th Cir. 2011). "[I]n order to have standing a plaintiff need not show that the requested relief

8   will inevitably alleviate the harm complained of. Where there are legal impediments to the

9   recovery sought, it is enough for standing that the relief sought will remove some of those legal

10  roadblocks, even if others may remain." *California Sea Urchin Comm'n v. Bean*, 883 F.3d 1173,

11  1181–82 (9th Cir. 2018)(*cert. denied sub nom. California Sea Urchin Comm'n v. Combs*, 17-

12  1636, 2018 WL 2689170 (U.S. Oct. 29, 2018)).  A plaintiff, however, does not establish

13  redressability where they seek "only remedies that would not be substantially likely to redress

14  [the] claimed injury . . . or which are beyond the district court's remedial power to issue." *M.S.

15  v. Brown*, 902 F.3d 1076, 1083–84 (9th Cir. 2018).

16      The State points out that there were two separate and independent grounds for the denial,

17  with prejudice, of the water quality certificate.  Dkt. 129.  The State asserts that even if this Court

18  finds that the decision to deny the water quality certificate was, in part, preempted by either

19  ICCTA or PWSA (because it considered the impacts of rail or vessels in the decision), those

20  preemption claims address only subparts of one of the two grounds on which the denial was

21  based.  *Id.*  The remaining grounds stand, so this Court cannot provide Lighthouse or BNSF the

22  relief they seek – vacating the denial of the water quality certificate.  *Id.*

23

24

1    The first ground for denial of the water quality certificate was the proposed terminal's

2    significant unavoidable adverse impacts identified in the FEIS.  Dkt. 1-1, at 4-14.  Those

3    identified areas were:  social and community resources, cultural resources, tribal resources, rail

4    transportation, rail safety, vehicle transportation, vessel transportation, noise and vibration, and

5    air quality.  Dkt. 130-1, at 43-45.

6    The second basis for the denial of the water qualify certificate was that the State did not

7    have reasonable assurance that the proposed terminal would meet applicable water quality

8    standards.  Dkt. 1-1, at 14-19.  The State found that Lighthouse failed to:  (1) submit an adequate

9    wetlands mitigation plan; (2) provide sufficient information regarding storm water and waste

10    water related to the proposed terminal (including:  characterization and treatment information, a

11    showing that all known, available, and reasonable methods of prevention, control and treatment

12    ("KART") would be met for both storm water and waste water generated by the proposed

13    terminal, inadequate information regarding mixing zones, determined if KART has been met, a

14    failure to provide information on contaminated water generated during the construction of the

15    terminal, a failure to demonstrate compliance with the State's anti-degradation water quality

16    standard);(3) show Lighthouse has adequate water rights for the proposed terminal, and (4)

17    provide adequate information regarding toxics cleanup. Dkt. 1-1, at 14-19.

18    Both Lighthouse and BNSF claim that they were damaged by the denial of the water

19    quality certificate.  Dkts. 1 and 22-1.  Lighthouse, in part, seeks as relief, a declaration that the

20    State's denial of the water quality certificate is preempted by ICCTA and the PWSA; an order

21    vacating any and all of the State's "illegal decisions" regarding the proposed terminal; "as well

22    as any federal, state or local decisions relying" on the State's "illegal decisions;" and an

23    injunction ordering the State not to deny Lighthouse's water quality certificate "or any other

24

1    permit or approval for the [proposed terminal] on the basis of rail or vessel traffic, or any other

2    potential environmental effects within the jurisdiction of the United States."  Dkt. 1, at 51-52.

3    BNSF seeks the same or similar relief.  Dkt. 22-1, at 24-25.

4         The State's motion for summary judgment dismissal of Lighthouse and BNSF's ICCTA

5    preemption claims and Lighthouse's PWSA preemption claim should be granted for lack of

6    standing due to a failure to show that this Court could grant relief to remedy their claimed

7    injuries (Dkt. 129).  They seek "only remedies that would not be substantially likely to redress"

8    their claimed injury or "which are beyond the district court's remedial power to issue."  *M.S.,* at

9    1083-84.  While Lighthouse and BNSF both seek a declaration that ICCTA and/or PWSA

10   preempts some of the grounds on which the decision was made, they make no showing that the

11   declaration by itself would remedy their injury.  Lighthouse and BNSF fail to show that even if

12   they demonstrate that ICCTA or the PWSA preempt some of the grounds upon which the State

13   based its denial of the water quality certificate, the State's entire decision could be vacated.

14   Several other grounds for that decision remain, apart from those related to vessel and rail.  BNSF

15   argues that the unprecedented denial of the certificate with prejudice demonstrates the State's

16   unwillingness to allow Lighthouse to cure any defects with its application related water quality

17   standards means that the decision was "based entirely on purported rail and vessel impacts." Dkt.

18   146.  Contrary to BNSF's position, review of the decision shows that there were other

19   "significant unavoidable adverse impacts," unrelated to rail or vessel impacts, found to be

20   relevant – impacts to social and community resources, cultural resources, and tribal resources,

21   including destruction of a historic district and impacts to fish populations from dredging and pile

22   driving (Dkt. 1-1, at 4-14).

23

24

1    Moreover, Lighthouse and BNSF fail to show that even if a portion of the grounds of the

2    water quality certificate were preempted, this Court would have jurisdiction to vacate all

3    "federal, state or local decisions relying" on the State's "illegal decisions" as requested in their

4    claims for relief.  There is no showing that this Court has the "remedial power to issue" such

5    relief.  *M.S.,* at 1083.

6    Lighthouse and BNSF also seek injunctive relief prohibiting the State from denying a

7    future Lighthouse application for a water quality certificate (or any other permit) based on rail or

8    vessel impacts or any other potential environmental effects.  Lighthouse argues that a ruling that

9    some of the grounds for the denial of the water quality certificate were impermissible (as

10   preempted by ICCTA and/or the PWSA) removes some "legal roadblocks" to having the

11   decision overturned, and so that is sufficient for redressability.  Dkt. 144.  While Lighthouse

12   maintains that a declaration from this Court (that some of the grounds for the decision were

13   improper) and injunction prohibiting consideration of the rail and vessel impacts would help in

14   the ongoing state court challenges to the decision, it fails to explain how it would help, beyond

15   mere speculation.

16   Lighthouse also asserts that a declaration that some of the grounds considered are

17   preempted and injunction from this Court prohibiting consideration of rail and vessel impacts

18   would make eventual approval of a water quality certificate be more likely than before.  *Id.*

19   There is not a sufficient showing on this issue – Lighthouse fails to show that a declaration and

20   an injunction is "substantially likely to redress" the claimed injury – the denial of the water

21   quality certificate.  For BNSF, however, the redressability connection is even more tenuous.

22   BNSF's claimed injury is the denial of a third party's (Lighthouse's) application for a water

23   quality certificate.  In order to BNSF to receive relief, it would not only have to be entitled to a

24

ORDER ON DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY
JUDGMENT - 10

1    declaration that consideration of the rail impacts was preempted by ICCTA and injunction that

2    rail impacts could not be considered, but it must rely on Lighthouse to re-apply for water quality

3    certificate, meet all the requirements, and then be approved.  BNSF failed to show that this Court

4    can prevent the claimed injury to it in the future; the connection is just too remote.

5         While both Lighthouse and BNSF point out that they have standing as to their other

6    claims, that issue is not before the Court.  The State did not move for summary judgment

7    dismissal of the other claims based on standing.  Moreover, the prior order of the Court related to

8    BNSF's standing was general in nature, related to whether BNSF could intervene in the case, and

9    did not squarely address whether BNSF had standing to assert a ICCTA claim.  Dkt. 47.

10        The motion for summary judgment to dismiss the preemption claims based on a lack of

11   standing should be granted.  Moreover, even if Lighthouse and BNSF could show that they had

12   standing, the motions for summary judgment should still be granted because the State's denial of

13   Lighthouse's application for a water quality certificate is not preempted by either ICCTA or the

14   PWSA, as explained below.

15   **C.  MOTIONS FOR SUMMARY JUDGMENT DISMISSAL OF LIGHTHOUSE'S CLAIM OF ICCTA PREEMPTION**

16

17        In ICCTA, "Congress abolished the [Interstate Commerce Commission], revised the

18   Interstate Commerce Act, and transferred regulatory functions under that Act to the Surface

19   Transportation Board ("Board")."  *DHX, Inc. v. Surface Transp Bd*., 501 F.3d 1080, 1082 (9th

20   Cir. 2007).  ICCTA grants the Board exclusive jurisdiction over "a wide range of state and local

21   regulation of rail activity."  *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist*., 622 F.3d

22   1094, 1097 (9th Cir. 2010).  "Generally speaking, ICCTA does not preempt state or local laws if

23   they are laws of general applicability that do not unreasonably interfere with interstate

24   commerce."  *Id.*

ORDER ON DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY
JUDGMENT - 11

1    "In order for federal preemption to apply under the ICCTA, the activity in question must

2    first fall within the statutory grant of jurisdiction to the [Board], one of several federal agencies

3    charged with railroad regulation." *Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State*

4    *Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016)(*citing* 49 U.S.C. § 10501(a)). As is relevant here, 49

5    U.S.C. § 10501(a) provides: "(1) Subject to this chapter, the Board has jurisdiction over

6    transportation by rail carrier that is— (A) only by railroad; or (B) by railroad and water [under

7    specified circumstances]." "If the Board has jurisdiction under 49 U.S.C. § 10501(a), the

8    question whether jurisdiction is exclusive—i.e., whether state regulation is preempted—is a

9    separate question governed by 49 U.S.C. § 10501(b)." *Oregon Coast,* at 1073.

10    "Board jurisdiction under § 10501(a) is a threshold question requiring that the disputed

11    activity meet three statutory prongs: it must be (1) transportation (2) by rail carrier (3) as part of

12    the interstate rail network." *Id.* (*internal quotation marks omitted*).  Courts in the Ninth Circuit

13    find "guidance on the scope of ICCTA preemption from the decisions of the [Board], to which

14    we owe *Chevron* deference." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist*., 622

15    F.3d 1094, 1097 (9th Cir. 2010)(*internal citations omitted*).  The Board notes that "[b]ecause the

16    Board has jurisdiction over 'transportation by a rail carrier,' 49 U.S.C § 10501 (a), to be subject

17    to the Board's jurisdiction and qualify for federal preemption under 49 U.S.C. § 10501 (b), the

18    activities at issue must be 'transportation' and must be performed by, or under the auspices of, a

19    "rail carrier.'" *Valero Ref. Co.,* S.T.B. No. FD 36036 (September 20, 2016), 2016 WL 5904757,

20    at 3.

21    As to the first prong § 10501(a), the activity being regulated, the proposed expansion of

22    the coal export terminal, meets the expansive definition of "transportation" under the Act.

23    *Valero,* at 3.

24

ORDER ON DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY
JUDGMENT - 12

1    As it relates to Lighthouse's preemption claim, the parties' dispute is on the second prong

2  of the jurisdiction analysis.  That is, on whether Lighthouse's proposed activities at the terminal

3  can be considered work done "by, or under the auspices of, a rail carrier."

4    The Defendants' motion to summarily dismiss Lighthouse's claim of ICCTA preemption

5  should be granted because the decisions at issue here do not regulate transportation "by, or under

6  the auspices of, a rail carrier." Lighthouse fails to meet this threshold requirement despite being

7  given extra time for discovery to make the requisite showing.  The Board's jurisdiction "extends

8  to rail-related activities that take place at transloading (or, as here, off-loading) facilities if the

9  activities are performed by a rail carrier, the rail carrier holds out its own service through a third

10 party that acts as the rail carrier's agent, or the rail carrier exerts control over the third party's

11 operations." *Valero,* at 3.

12    This case is like *Valero.*  In *Valero,* Valero Refining Company asked the Board to issue a

13 declaratory order that a city's decision denying certification of an environmental impact report

14 ("EIR") and denying a conditional use permit for a crude oil off-loading facility (which would be

15 served by Union Pacific Railroad Company ("UP")) were preempted by federal law.  As is the

16 case here, Valero pointed out that "in addition to addressing potential environmental impacts at

17 the proposed facility location, the EIR disclosed potential environmental impacts from proposed

18 UP rail operations between the [refinery] and California's borders with Oregon and Nevada."

19 *Id.,* at 1.  Further, the EIR "did not include proposed mitigation for the potential environmental

20 impacts of UP rail operations because . . . city staff determined that such measures would be

21 preempted by [ICCTA]."  *Id.* After the city denied certification of the EIR and a conditional use

22 permit, Valero challenged the city's denial as "impermissibly based on findings of environmental

23 impacts related to UP's increased rail traffic."  *Id.*, at 2.  Valero asserted that the city's decisions

24

1    amounted to "impermissible indirect rail regulation," and that they were preempted by ITCCA.

2    *Id.*  In concluding that it did not have jurisdiction (the city's denial of the use permit was not

3    preempted by ITCCA), the Board found that Valero had not shown that it was a rail carrier, or

4    that it would be performing "transportation-related activities on behalf of UP or any other rail

5    carrier at its off-loading facility."  *Id.,* at 3.

6         As in *Valero*, Lighthouse points to no evidence that it is a rail carrier, or that it will be

7    "performing transportation-related activities on behalf of [BNSF] or that any other rail carrier" at

8    the proposed terminal.  There is no showing that BNSF will "exert[] control over" Lighthouse's

9    operations at the facility.  Lighthouse is not a rail carrier, and has pointed to no evidence that it

10   will be acting under the auspices of a rail carrier at the proposed terminal.  There is no ICCTA

11   preemption because the State's decision to deny Lighthouse a water quality certificate does not

12   regulate transportation by a "rail carrier."  Lighthouse's supplemental materials (Dkts. 188-188-

13   3) do not address whether Lighthouse is a "rail carrier," or will be acting under the auspices of a

14   rail carrier for purposes of the jurisdictional analysis pursuant to § 10501(a) regarding the

15   regulated activity, which is the threshold question.  The Defendants' motion for summary

16   judgment to dismiss this preemption claim should be granted, and Lighthouse's claims for

17   ICCTA preemption should be dismissed.

18        D.  **MOTIONS FOR SUMMARY JUDGMENT DISMISSAL OF BNSF'S CLAIM
              OF ICCTA PREEMPTION**

19

20        The motions for summary judgment dismissal of BNSF's claim of ICCTA preemption

     should be granted.  First, BNSF has failed to show that the Board has jurisdiction over the

21   disputed activity - whether Lighthouse should be permitted to construct and operate an expanded

22   coal export facility.

23

24

1    The three statutory prongs to be considered in determining whether the Board has

2    jurisdiction, under § 10501 (a), over the proposed additional construction and expanded

3    operations at the terminal is: "(1) transportation (2) by rail carrier (3) as part of the interstate rail

4    network."

5    The parties do not dispute that the activities Lighthouse proposed constitute

6    "transportation" under the first prong under § 10501 (a).  While "[s]tate or local permitting or

7    preclearance requirements, including building permits, zoning ordinances, and environmental

8    and land use permitting requirements, are categorically preempted as to any facilities that are

9    part of transportation by a rail carrier," *Valero,* at 5, n. 4, the activities regulated here, are those

10   of Lighthouse, not BNSF.  BNSF fails to point to issues of material fact that the State's denial of

11   Lighthouse's application for a clean water certificate is a preempted action because it was not a

12   regulation of BNSF or denial of an application by BNSF.  This central problem permeates

13   BNSF's theory of its ICCTA claim; this has been true since the beginning of the case.  The

14   undersigned gave BNSF every opportunity to develop its claim.

15   As stated above, the State's denial of Lighthouse's clean water certificate was based on

16   two grounds: first was that the proposed terminal's significant unavoidable adverse impacts

17   identified in the FEIS conflicted with the Washington State Environmental Policy Act ("SEPA")

18   policies in WAC 173-802-110.  Dkt. 1-1, at 4-14.  The findings in FEIS were not challenged.

19   Only some of the significant unavoidable adverse impacts in the FEIS were related to rail; they

20   also included impacts to social and community resources, cultural resources, tribal resources, and

21   vessel transportation.  Dkt. 130-1, at 43-45.  The second basis for the denial of Lighthouse's

22   application was that the State did not have reasonable assurance from Lighthouse that the

23   proposed terminal would meet applicable water quality standards.  Dkt. 1-1, at 14-19.

24

1    BNSF asserts that, even if the denial of Lighthouse's application for a clean water

2    certificate is not categorically preempted under ICCTA, the State's denial is pre-empted "as

3    applied."  BNSF points to an expert's opinion that (1) "railroads operate in a declining cost,

4    capital-intensive industry that requires them to take advantage of economies of scale, scope and

5    density to cover costs," (2) coal is rail's number one commodity, but coal shipments are

6    declining, (3) domestic demand for coal is falling, (4) because of "falling domestic demand and

7    declining revenue-per-carload across all commodity sectors," efforts by the State to prevent the

8    project "burdens BNSF's rail operations and interfere with its ability to maintain economies of

9    scale, scope, and density."  Dkts. 191-191-1.

10    Some "state actions may be preempted as applied – that is, only if they would have the

11    effect of unreasonably burdening or interfering with rail transportation."  *Valero,* at 5, n. 4.

12    "ICCTA preempts all state laws that may reasonably be said to have the effect of managing or

13    governing rail transportation, while permitting the continued application of laws having a more

14    remote or incidental effect on rail transportation. What matters is the degree to which the

15    challenged regulation burdens rail transportation."  *Ass'n of Am. Railroads v. S. Coast Air*

16    *Quality Mgmt. Dist.*, 622 F.3d 1094, 1097–98 (9th Cir. 2010)(*internal quotation marks and*

17    *citations omitted*).

18    The activity being regulated by the denial of the clean water certificate is the building and

19    operation of the expanded coal export terminal.  While BNSF has demonstrated that it stands to

20    lose profits as a result of the State's denial of Lighthouse's application for the clean water

21    certificate, the results are "remote or incidental."  BNSF stands to lose profits if any potential

22    customers are denied permits to start or expand businesses which utilize rail.  The motions to

23    summarily dismiss BNSF's ICCTA claim should be granted and the claim dismissed.

24

1

2

## E. MOTIONS FOR SUMMARY JUDGMENT DISMISSAL OF LIGHTHOUSE'S CLAIM OF PWSA PREEMPTION

3

Enacted to ensure vessel safety and the protection of navigable waters, the PWSA

4

contains no express preemption provision. *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 487

5

(9th Cir. 1984). It "contains two somewhat overlapping titles, both of which may . . . preclude

6

enforcement of state laws, though not by the same pre-emption analysis." *U.S. v. Locke*, 529

7

U.S. 89, 101 (2000).

8

1. PWSA Title I – Conflict Preemption

9

Title I concerns vessel traffic 'in any port or place under the jurisdiction of the United

10

States.'" *Id. (quoting* 33 U.S. § 1223 (a)(1)). "Under Title I, the Coast Guard may enact

11

measures for controlling vessel traffic or for protecting navigation and the marine environment,

but it is not required to do so." *Id.*

12

The subject and scope of the PWSA's Title I "allows a State to regulate its ports and

13

waterways, so long as the regulation is based on the peculiarities of local waters that call for

14

special precautionary measures." *Locke,* at 109 (*internal quotation marks and citations omitted*).

15

"The analysis under Title I of the PWSA, then, is one of conflict pre-emption," not field

16

preemption. *Id.* "Title I allows state rules directed to local circumstances and problems, such as

17

water depth and narrowness, idiosyncratic to a particular port or waterway." *Id.* "There is no

18

pre-emption by operation of Title I itself if the state regulation is so directed and if the Coast

19

Guard has not adopted regulations on the subject or determined that regulation is unnecessary or

20

inappropriate." *Id.* This principle is consistent with recognition of an important role for States

21

and localities in the regulation of the Nation's waterways and ports. *Id.* "The States may enforce

22

rules governed by Title I of the PWSA unless they run counter to an exercise of federal

23

authority." *Id.* "The relevant inquiry for Title I pre-emption as whether the Coast Guard has

24

1    promulgated its own requirement on the subject or has decided that no such requirement should

2    be imposed at all." *Id.*, at 109-110.

3            To the extent that Lighthouse bases its PWSA claim on Title I, the motions for summary

4    judgment should be granted.  Lighthouse fails to show that preemption applies.  The decision to

5    deny it a water quality certificate did not set regulations that attempted to control vessel traffic or

6    navigation on the Columbia River.  Moreover, Lighthouse fails to point to any regulations

7    promulgated by the Coast Guard "controlling vessel traffic or for protecting navigation and the

8    marine environment," *Locke,* at 109, for the Columbia River or that the Coast Guard determined

9    that the river does not need such regulation.  Lighthouse fails to point to any issues of fact that

10   the State's decision to deny Lighthouse a clean water certificate to build a facility partially on

11   land and partially as docks in the riverbed "run[s] counter to an exercise of federal authority."

12   *Locke,* at 109.  It does not require conduct that conflicts with federal law.  Lighthouse points to

13   an expert opinion that challenges findings in the Final EIS related to the significance of possible

14   vessel accidents that may occur if the project goes forward and argues that this creates issues of

15   fact. Dkt. 187.  Its assertion is unpersuasive.  Lighthouse fails to show that this evidence is

16   relevant to whether the decision to deny the water quality certificate conflicts with the PWSA.

17   To the extent that Lighthouse bases its PWSA claim on Title I, the claim should be dismissed.

18              2.  PWSA Title II – Field Preemption

19          "Title II requires the Coast Guard to impose national regulations governing the general

20   seaworthiness of tankers and their crews."  *Locke,* at 110 (*internal citation omitted*).  Under the

21   Supreme Court's interpretation of Title II, "only the Federal Government may regulate the

22   'design, construction, alteration, repair, maintenance, operation, equipping, personnel

23

24

1   qualification, and manning of tanker vessels.'" *Id.*, at 110-111 (*quoting* 46 U.S. § 3703 (a)).

2   Accordingly, field preemption applies to such activities. *Id.*, at 111.

3        There is no reasonable assertion that the State decision at issue here, the denial of the

4   water quality certificate, implicate PWSA's Title II - the "design, construction, alteration, repair,

5   maintenance, operation, equipping, personnel qualification, and manning of tanker vessels" 46

6   U.S. § 3703 (a).  To the extent that Lighthouse makes a claim for PWSA Title II preemption, the

7   motions for summary judgment to dismiss this claim should be granted.

8                              **III.    ORDER**

9        Therefore, it is hereby **ORDERED** that:

10   • The Defendant State's Motion for Summary Judgment on Preemption Issues (Dkt. 129)

11      and Intervenor-Defendants WEC's Motion for Partial Summary Judgment on Preemption

12      Claims (Dkt. 128) **ARE GRANTED**;

13   • Lighthouse's and BNSF's ITCCA preemption claims and Lighthouse's PWSA

14      preemption claim **ARE DENIED** and those claims **ARE DISMISSED**.

15        The Clerk is directed to send uncertified copies of this Order to all counsel of record and

16   to any party appearing *pro se* at said party's last known address.

17        Dated this 11th day of December, 2018.

18

19

20   ROBERT J. BRYAN
     United States District Judge

21

22

23

24