1

2

3

4

5

6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

LIGHTHOUSE RESOURCES, INC., *et al.*,

Plaintiffs,

8

and

9

BNSF RAILWAY COMPANY,

Plaintiff-Intervenor,

10

11

v.

JAY INSLEE, *et al*.,

12

Defendants,

13

and

14

WASHINGTON ENVIRONMENTAL
COUNCIL, *et al*.,

15

Defendant-Intervenors.

16

No.  3:18-cv-05005-RJB

WEC'S MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' DORMANT
AND FOREIGN COMMERCE CLAUSE
CLAIMS

NOTE FOR MOTION CALENDAR:
March 15, 2019

ORAL ARGUMENT REQUESTED

17

18

19

20

21

22

23

24

25

26

27

28

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 1

ARGUMENT ........................................................................................................ 3

    I.       THE CHALLENGED ACTIONS DO NOT DISCRIMINATE AGAINST
           INTERSTATE COMMERCE. .................................................................. 4

        A.   The Commerce Clause Is Primarily Focused on State or Local
             Actions that Discriminate Against Interstate Commerce. ................................ 4

        B.   The § 401 Permit Denial Is Not Discriminatory ........................................... 5

    II.      THE § 401 DENIAL RATIONALLY REGULATES TO ACHIEVE
           LEGITIMATE STATE PURPOSES. ....................................................... 8

        A.   This Court Should Give Preclusive Effect to the FEIS. ................................. 8

            1.   State administrative decisions have found the FEIS to be final. .......... 9

            2.   Federal courts give preclusive effect to state administrative
                proceedings. ......................................................................................... 10

        B.   Non-Discriminatory State and Local Actions are Subject to the Highly
             Deferential *Pike* Balancing Test. .................................................................. 11

        C.   The Denial Does Not Impose a Significant Burden on Interstate
             Commerce. ................................................................................................. 13

        D.   The Benefits of Denying the Terminal Are Well-Documented ..................... 17

    III.     THE § 401 DENIAL DOES NOT VIOLATE THE FOREIGN
           COMMERCE CLAUSE. ......................................................................... 19

        A.   Overview of Foreign Commerce Clause ....................................................... 19

        B.   The § 401 Permit Denial Does Not Violate the Foreign Commerce
             Clause. ........................................................................................................ 20

CONCLUSION .................................................................................................... 21

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB            i

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. City of Long Beach*,
  951 F.2d 977 (9th Cir. 1991) ...................................................................11, 12, 18

*Antilles Cement Corp. v. Acevedo Vila*,
  408 F.3d 41 (1st Cir. 2005)....................................................................................19

*Chinatown Neighborhood Ass'n v. Harris*,
  794 F.3d 1136 (9th Cir. 2015) ...............................................................................3

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978)................................................................................................4

*Columbia Aggregates, Inc. v. Whatcom County*,
  121 F.3d 715 (9th Cir. 1997) (unpublished decision).............................................4

*Columbia Pacific Bldg. Trades Council v. City of Portland*,
  289 Or. App. 739 (Or. Ct. App. 2018)..........................................................6, 8, 13

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008)................................................................................................3

*Exxon Corp. v. Governor of Maryland*,
  437 U.S. 117 (1978)...................................................................................... *passim*

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997)................................................................................................6

*General Motors Corp. v. EPA*,
  168 F.3d 1377 (D.C. Cir. 1999) ............................................................................10

*Hass v. Oregon State Bar*,
  883 F.2d 1453 (9th Cir. 1989) ...............................................................................6

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979)................................................................................................3

*Hunt v. Washington State Apple Advertising Comm'n*,
  432 U.S. 333 (1977)..............................................................................................12

*Japan Line v. County of Los Angeles*,
  441 U.S. 434 (1979)........................................................................................19, 20

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                    ii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Kleenwell Biohazard Waste v. Nelson*,
  48 F.3d 391 (9th Cir. 1995) ...................................................................5, 10, 17

*Maine v. Taylor*,
  477 U.S. 131 (1986).........................................................................................5

*Minnesota v. Clover Leaf Creamery Co.*,
  449 U.S. 456 (1981).................................................................................12, 17

*National Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ...........................................................7, 13, 17

*Natsios v. Nat'l Foreign Trade Council*,
  181 F.3d 38 (1st Cir. 1999)..............................................................19, 20

*Norfolk Southern Corp. v. Oberly*,
  822 F.2d 388 (3rd Cir. 1987) ................................................................ *passim*

*Oregon Waste Sys v. Dep't of Envtl. Quality*,
  511 U.S. 93 (1994)..........................................................................................4

*Pacific NW Venison Prod. v. Smitch*,
  20 F.3d 1008 (9th Cir. 1994) .......................................................................19, 20

*PhRMA v. Concannon*,
  249 F.3d 66 (1st Cir. 2001)............................................................................14

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) .............................................................................. *passim*

*Portland Pipe Line Corp. v. City of South Portland*,
  332 F. Supp. 3d 264 (D. Me. 2018) ........................................................ *passim*

*Raymond Motor Trans. v. Rice*,
  434 U.S. 439 (1978)......................................................................................12

*Stand.Earth v. Skagit County*
  SHB 18-011 (Wash. Shorelines Hearings Board, Sept. 28, 2018) .........................11

*University of Tennessee v. Elliot*,
  478 U.S. 788 (1986)......................................................................................10

*Walgreen Co. v. Rullan*,
  405 F.3d 50 (1st Cir. 2005).............................................................................4

*Wood Marine Serv. v. City of Harahan*,
  858 F.2d 1061 (5th Cir. 1988) .............................................................13, 17, 18

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                                iii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Yakima Valley Hosp. v. Washington Dep't of Health*,
    731 F.3d 843 (9th Cir. 2013) ................................................................................15

**Constitutional Law**

Commerce Clause
    U.S. Const. Art I, § 8 ................................................................................ *passim*

U.S. Constitution ...............................................................................................3, 7, 15

**Statutes**

Clean Water Act
    33 U.S.C. § 1341 .................................................................................... *passim*

State Environmental Policy Act ...................................................................1, 2, 3, 11

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                    iv

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

INTRODUCTION

Defendant-Intervenors Washington Environmental Council *et al.* ("WEC") move for summary judgment on Counts I and II of Plaintiff Lighthouse Resources' Complaint (ECF 1), and Counts II and III of Plaintiff-Intervenor BNSF's Complaint (ECF 22-1).  Plaintiffs allege that the Washington Department of Ecology violated the interstate and foreign dormant commerce clauses when it denied Lighthouse a certification under § 401 of the Clean Water Act ("CWA") for its proposed 44-million-ton-per-year coal handling facility on the Columbia River.  There are no material facts in dispute as to these claims, which can be decided as a matter of law.

The dormant commerce clause prohibits state and local regulations that protect in-state economic interests at the expense of out-of-state interests.  Its goal is to preserve the free flow of commerce in the face of unfair economic discrimination between states.  In rare cases, the commerce clause is invoked to prevent arbitrary state and local actions that cause significant harm to commerce without any corresponding benefit.  It emphatically does not prevent states and local communities from protecting the health, safety, and welfare of their citizens, roles that lie at the core of federalism, wherever there is some incidental impact on commerce.  Because Ecology's § 401 denial does not in any way "discriminate" against interstate or foreign commerce, and because the state did not act "irrationally" in weighing the benefits and burdens of denial, this Court has no further role.  Summary judgment in WEC's favor should be granted.

BACKGROUND

The Court is already familiar with the background of this case, which concerns Lighthouse's efforts to build a major coal export terminal along the banks of the Columbia River in Longview, Washington.  With an anticipated throughput of up to 44 million metric tons of coal per year, the terminal would be the largest of its kind in North America.  The project has had a tumultuous history dating back to 2010, and has generated unprecedented controversy.

Because the project would require multiple state and local permits, Washington's State Environmental Policy Act ("SEPA") mandated that Cowlitz County and Ecology conduct a careful

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                    1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1   review of the project's environmental and public health impacts.  That process, which involved years

2   of study and multiple rounds of public comment and hearings, culminated in a Final Environmental

3   Impact Statement ("FEIS"), released in April 2017.  The FEIS examined the impacts of the project in

4   multiple areas and was supported by extensive technical analysis.  The FEIS identified nine areas of

5   significant, adverse harm from the proposed coal terminal that could not be mitigated.  Order on

6   Motions for Partial Summary Judgment (ECF 200) ("Preemption Order"), at 3; FEIS Summary (ECF

7   130-1).  The nine areas included adverse impacts to human health from the noise and pollution

8   caused by the coal trains that would enter and exit the terminal daily; delays in traffic along the rail

9   line; increased risks of vessel collisions in the Columbia River; impacts to Treaty-protected Tribal

10   fishing rights; and disproportionate impacts on communities of lower income or people of color.  *Id.*

11   Particularly relevant to this motion, the FEIS studied in considerable detail the impact of

12   operating a massive coal export terminal on domestic and international coal markets.  *See*

13   Declaration of Jan Hasselman ("Hasselman Decl."), Ex. 1 (FEIS).  Many commenters, including

14   WEC, had urged Ecology to study market impacts out of concern that terminal operations would

15   increase the amount of coal that was consumed by inducing additional demand through lower prices.

16   The FEIS, however, found this influence to be either modest or nonexistent.  A technical study

17   produced as part of the FEIS process noted that the global coal export market was vast, with the top

18   12 coal exporting nations exporting 1.4 billion tons of coal in 2014.  Hasselman Decl., Ex. 2

19   ("Market Study"), at 3-2.  The study found that the United States, although a major producer of coal,

20   played a minor role in the international coal trade compared to other countries.  *Id.*  The study also

21   documented a number of existing coal terminals on the west coast with millions of tons of export

22   capacity, *Id.* at 2-12, as well as planned expansions and new terminals.  *Id.* at 5-8.

23   Modeling the export of 44 million metric tons of coal from the terminal into the international

24   coal market, the FEIS analysis found that for the most part the exported coal would simply displace

25   coal from some other source, resulting in "small to no increases" in coal consumed under most

26   scenarios.  *Id.* at 1-5.  For example, under the scenario that modeled current market and policy trends

27   WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
28   COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                    2

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    without continued implementation of the federal Clean Power plan, the analysis concluded that

2    operation of the terminal would increase the amount of coal consumed in Asia by less than one-tenth

3    of one percent. *Id.* at 6-15. In other scenarios, the effect was even less. Ultimately, unlike many

4    other impacts, the FEIS did not conclude that there was a meaningful impact on coal markets as a

5    result of the operation of the terminal. No party challenged the FEIS, which Ecology relied on in

6    part when denying the § 401 certification challenged in this case.

7                                              ARGUMENT

8            Under the U.S. Constitution, Congress has the power to regulate commerce with foreign

9    nations and among the states. U.S. Const. Art I, § 8. This authority exists "to avoid the tendencies

10   toward economic Balkanization" that had plagued the colonies and early states. *Hughes v.*

11   *Oklahoma*, 441 U.S. 322, 325 (1979). That goal is balanced against another key constitutional

12   goal—the preservation of "federalism favoring a degree of local autonomy." *Dep't of Revenue of*

13   *Ky. v. Davis*, 553 U.S. 328, 338 (2008). A local statute or ordinance can violate the dormant

14   commerce clause if it a) "discriminates" against interstate commerce, that is, it seeks to protect in-

15   state economic interests at the expense of out-of-state economic interests, *see Exxon Corp. v.*

16   *Governor of Maryland*, 437 U.S. 117, 127 (1978); or b) if its burdens on interstate commerce are

17   "clearly excessive" in relation to its benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142

18   (1970).[1]

19           Virtually every case discussing these principles involves a local *statute or regulation*. WEC

20   is unaware of any case where a court struck down an *individual permit decision* under a commerce

21   clause analysis. Indeed, in one of the only cases that even involved such a challenge, the Ninth

22   Circuit swiftly rejected a commerce clause claim against a county's denial of a gravel-mining

23   _____

24   [1] A separate line of cases prohibits local action that regulates "extraterritorially," *i.e.,* outside the
     jurisdiction. Neither Lighthouse nor BNSF has made any allegation that the § 401 certification

25   denial constitutes "extraterritorial" regulation. Any such claim would easily fail, as a state may
     regulate commercial relationships in which one party is located in-state, and even extraterritorial

26   effects are permissible where they "result from the regulation of in-state conduct." *Chinatown
     Neighborhood Ass'n v. Harris,* 794 F.3d 1136 (9th Cir. 2015).

27   WEC'S MOTION FOR SUMMARY JUDGMENT
     ON PLAINTIFFS' DORMANT AND FOREIGN                              *Earthjustice*

28   COMMERCE CLAUSE CLAIMS                                          *705 Second Ave., Suite 203*
     Case No. 3:18-cv-05005-RJB                    3                *Seattle, WA  98104*
                                                                    *(206) 343-7340*

permit.  *Columbia Aggregates, Inc. v. Whatcom County*, 121 F.3d 715 (9th Cir. 1997) (unpublished decision).  The Ninth Circuit found that there was no evidence that the county was seeking to "discriminate" in favor of in-state interest, and that any burden on commerce was not excessive in light of the county's interest in regulating mining near an aquifer.  *Id*. at *2.

I.     THE CHALLENGED ACTIONS DO NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE.

    A.     The Commerce Clause Is Primarily Focused on State or Local Actions that Discriminate Against Interstate Commerce.

        The goal of the commerce clause is to prevent "discrimination" against interstate commerce. Discrimination in this context does not mean "impact" or even "harm."  Rather, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Oregon Waste Sys v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).  "Under the dormant Commerce Clause, if a state law has either the purpose or effect of significantly favoring in-state commercial interests over out-of-state interests, the law will routinely be invalidated unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism."  *Walgreen Co. v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005).  Accordingly, discrimination against out-of-state interests that is motivated by a desire to protect in-state economic interests is subject to the strictest judicial scrutiny.  *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) (contrasting "economic isolation and protectionism" from "incidental burdens on interstate commerce [that] may be unavailable when a State legislates to safeguard the health and safety of its people.").

        This doctrine is intended to protect interstate *markets*—not individual companies.  In *Exxon Corp.*, 437 U.S. at 127, for example, a state passed a statute that prohibited "producers or refiners" of gasoline from operating retail service stations in the state.  There were no "producers or refiners" in the state, meaning that all of the entities affected by the law were out-of-state.  However, because

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                         4

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the statute did nothing to advantage in-state parties, there could be no "discrimination" for

commerce clause purposes, despite the harm to out-of-state businesses.

> While the refiners will no longer enjoy the same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers.  The fact that the burden of a state regulations falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce....[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

*Id*.  This precedent "explicitly rejected the notion that any regulation that affects particular

companies engaged in interstate commerce necessarily represents an impermissible burden upon it."

*Kleenwell Biohazard Waste v. Nelson*, 48 F.3d 391, 397 (9th Cir. 1995).

Even where "discrimination" exists, it will be upheld where it is justified by a legitimate

purpose that cannot otherwise be achieved.  In *Maine v. Taylor*, 477 U.S. 131 (1986), the Supreme

Court upheld a Maine statute banning the importation of certain baitfish from out of state.  Even

though the statute advantaged in-state baitfish producers, the statute was upheld because the

evidence showed a legitimate purpose behind the statute—specifically, protection of the

environment and fisheries from potential parasites—and no alternative means to achieve it.

> The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values.  As long as a State does not needlessly obstruct interstate trade or attempt to "place itself in a position of economic isolation," it *retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources*.

*Id*. at 151 (internal citations omitted) (emphasis added).

    B.    <u>The § 401 Permit Denial Is Not Discriminatory.</u>

Ecology's § 401 permit denial is not discriminatory in any sense under the commerce

clause.  Ecology denied a permit to a specific entity to operate a specific coal terminal at a specific

place on the Columbia River, due to its adverse environmental, health, and other impacts.  The

decision was agnostic as to whether the project proponent was in- or out-of-state.  *Portland Pipe*

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB        5

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Line Corp. v. City of South Portland*, 332 F. Supp. 3d 264, 230 (D. Me. 2018) (upholding ordinance that "does not distinguish between out-of-state and in-state interests"). It was agnostic to both the origin of the products shipped through the terminal and their destination. Ecology did not prohibit the movement of coal through the state of Washington, the use of coal in any in-state facility, or the export of coal. Rather, the decision was one of several that found the project did not meet the state's regulatory standards. There is simply no constitutional issue in this scenario. *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 401 (3rd Cir. 1987) (statute banning coal loading "does not prohibit the export, import, or transshipment of coal," and even if it did, "[i]t is the discrimination against interstate versus intrastate movements of goods, rather than the blockage of the interstate flow per se, that triggers heightened scrutiny review").

Discrimination for commerce clause purposes also cannot exist where there is no in-state entity that is advantaged by the challenged action. *Hass v. Oregon State Bar*, 883 F.2d 1453, 1462 (9th Cir. 1989) (rejecting commerce clause challenge because "[i]n state and out-of-state insurance companies are burdened in exactly the same way"). "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). "In the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id.* at 300. In a recent decision with many parallels to this case, a district court in Maine found that a crude oil loading ban was not discriminatory because plaintiff was "the only pipeline company in South Portland and the only company seeking to load crude oil onto tank vessels in the city of South Portland." *Portland Pipe Line*, 332 F. Supp. 3d at 230; *see also Columbia Pacific Bldg. Trades Council v. City of Portland*, 289 Or. App. 739, 748 (Or. Ct. App. 2018) (upholding a city ordinance banning fossil fuel terminals because there were no in-state entities refining or shipping fossil fuels).

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                    6

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1      There can be no discrimination in this case because there is no significant coal production in

2   Washington, no Washington businesses involved in the shipment for export of coal, and no other

3   coal export terminals—as even Lighthouse's expert concedes.  Deposition of Dr. Mark Berkman

4   (Hasselman Decl. Ex. 3), at 126 ("I don't see anything that was going to benefit the state then,

5   financially or in an economic development sense, that would have biased their views").  In fact, any

6   economic harm from the § 401 denial would fall *inside* the state, as it would be deprived of the

7   claimed economic benefits of constructing and operating the terminal.  *See Portland Pipe Line,* 332

8   F. Supp. 3d at 313 (rejecting commerce clause challenge where "predominant impacts on jobs and

9   commercial revenues will fall on local Maine companies and their resident employees").  Ecology's

10  § 401 denial simply was not a protectionist measure.

11     WEC assumes that the § 401 denial frustrates Lighthouse's plans to "make as much money

12  as possible" exporting coal, as its 30(b)(6) witness described it.  Deposition of Jordan Sweeney

13  (Hasselman Decl. Ex. 4), at 57.  WEC further assumes for the sake of argument that some U.S. coal

14  companies would benefit if the terminal was built.  Expert Report of Seth Schwartz (Hasselman

15  Decl. Ex. 5), at 15.  However, as the U.S. Supreme Court has emphasized, the U.S. Constitution

16  doesn't protect any individual firm or its business plans.  *Exxon*, 437 U.S. at 128.  As long as there

17  is no *discrimination* to protect in-state interests at the expense of out-of-state businesses, the fact

18  that Lighthouse is adversely impacted "relates to the wisdom" of the challenged action, "not to its

19  burden on commerce."  *Id.*; *National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,

20  1148 (9th Cir. 2012) ("state regulation does not become vulnerable to invalidation under the

21  dormant Commerce Clause merely because it affects interstate commerce").

22     Lighthouse's theory in this case appears to be that Ecology covertly conspired to block coal

23  exports based on some generic hostility to coal.  This theory suffers from at least two major

24  problems.  It fails as a matter of law because the discrimination that is relevant for commerce clause

25  pertains to economic protectionism, not an alleged putative hostility for any particular item in

26  commerce.  WEC is unaware of any case that found "discrimination" based on hostility to a

27
28  WEC'S MOTION FOR SUMMARY JUDGMENT
    ON PLAINTIFFS' DORMANT AND FOREIGN
    COMMERCE CLAUSE CLAIMS
    Case No. 3:18-cv-05005-RJB     7

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

particular product.  The theory also fails as a factual matter.  After a year of discovery, millions of pages of documents produced, and countless hours in depositions, Lighthouse has not produced a single shred of evidence to support this theory.  To the contrary, the evidence shows that Ecology proceeded painstakingly through a fair and rigorous environmental review and made a well-supported decision that the coal terminal caused too much harm and offered too little benefit.  The same decision was made by other state and local agencies, all of which have been upheld on appeal.  Courts elsewhere have sustained far more heavy-handed restrictions on the movement of fossil fuels than this.  *See, e.g., Norfolk Southern*, 822 F.2d at 402 (coal loading ban); *Portland Pipe Line*, 332 F. Supp. 3d at 313 (prohibition on oil transfers); *Columbia Pacific Bldg.*, 289 Or. at 748 (ban on all fossil fuel terminals).

II.     THE § 401 DENIAL RATIONALLY REGULATES TO ACHIEVE LEGITIMATE STATE PURPOSES.

Where an ordinance "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.  Lighthouse does not come close to meeting the *Pike* standard.  Even Lighthouse agrees that the § 401 denial has little to no effect on the Asian coal export market and serves legitimate "benefits" in terms of protecting human health, the environment, and other important local goals.  Lighthouse cannot survive summary judgment on its *Pike* claim.

A.     This Court Should Give Preclusive Effect to the FEIS.

As a threshold matter, Lighthouse's *Pike* challenge should be resolved within the four corners of the FEIS, without allowing additional factual evidence that contradicts it.  Lighthouse did not appeal the FEIS under state law.  Neither did BNSF, WEC, or anyone else.  As a consequence, multiple state and local appellate bodies have ruled that under state law, the findings of the FEIS are final and binding.  This Court must give preclusive effect to these state administrative decisions.  Lighthouse should not be able to avoid summary judgment by manufacturing factual disputes about

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                8

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    issues that were conclusively resolved in the FEIS that it chose not to appeal.  Specifically, the FEIS

2    concluded that the terminal would have virtually zero impact on the Asian coal export market.  This

3    Court should defer to that finding.

4              *1.    State administrative decisions have found the FEIS to be final.*

5              Multiple state and local agencies have relied on the FEIS to inform permitting decisions for

6    the terminal.  For example, the Cowlitz County Hearing Examiner conducted a multi-day evidentiary

7    hearing to assess whether the terminal was consistent with local development and shorelines codes.

8    On Nov. 14, 2017, the County denied those permits.  ECF 1-3.  The decision relied on the FEIS and

9    its findings of nine serious, unmitigatable adverse effects.  After the project proponent refused to

10   offer an adequate mitigation plan for the project's greenhouse gas emissions, the County deemed

11   those emissions a tenth serious adverse unmitigated impact.  The Hearing Examiner rejected any

12   evidence that was "in conflict" with the FEIS, finding that the FEIS was "unchallenged."  *Id.* at 49.

13   While the Hearing Examiner gave the proponent the opportunity to offer additional mitigation to

14   offset these impacts, it failed to do so.  *Id.* at 50-51 ("Failure to reasonably mitigate these impacts

15   conflicts with virtually every one of the County's environmental policies….").  Millennium appealed

16   this decision to the Shorelines Hearing Board ("SHB"), which upheld the County's decision.

17   Hasselman Decl. Ex. 6.  The SHB similarly found that because no one had appealed the FEIS, its

18   contents "cannot be challenged" and "stands as jointly written and approved."  *Id.*, at 21.

19   Millennium petitioned for review of this determination, but its petition did not challenge the FEIS in

20   any way.

21             The FEIS also played a major role in the decision challenged in this case, the § 401 denial by

22   Ecology.  Preemption Order, at 4.  Millennium appealed Ecology's decision to the Pollution Control

23   Hearings Board ("PCHB"), which upheld the denial.  ECF 130-6.  Like the SHB, the PCHB found

24   that because Millennium never disputed the factual findings of the "unchallenged FEIS," the Board

25   would not "substitute its judgment for that of Ecology."  *Id.* at 20.  Millennium appealed the PCHB's

26

27   WEC'S MOTION FOR SUMMARY JUDGMENT
     ON PLAINTIFFS' DORMANT AND FOREIGN
28   COMMERCE CLAUSE CLAIMS
     Case No. 3:18-cv-05005-RJB                    9

1  decision as well, but as before, this appeal did not raise any questions about the substance of the

2  FEIS factual findings.

3      2.  *Federal courts give preclusive effect to state administrative proceedings.*

4    The Supreme Court outlined the standard for deciding when the findings of a state

5  administrative body should be given "preclusive effect" by a federal court in *University of*

6  *Tennessee v. Elliot*, 478 U.S. 788, 799 (1986).  "When a state agency 'acting in its judicial capacity

7  … resolves issues of fact properly before it which the parties have had an adequate opportunity to

8  litigate,' federal courts must give the agency's fact-finding the same preclusive effect to which it

9  would be entitled in the State's courts."  *Id.*  Applying this precedent in the context of a commerce

10  clause challenge, the Ninth Circuit gave preclusive effect to the fact-finding of the Washington

11  Utilities and Transportation Commission in *Kleenwell Biohazard*, 48 F.3d at 394.  There, the Ninth

12  Circuit found that the proceeding concerned issues that were properly before the Commission, and

13  that the Commission had provided an adjudicative proceeding "that provided an adequate

14  opportunity for both parties to present their cases."  *Id.* at 394.  It further found that the Commission

15  proceedings were carried out in accordance with state requirements, presided over by an

16  independent judge, and that all parties had ample opportunity to present evidence and argue their

17  perspectives.  *Id.*  It further found that the factual findings of the Commission would be given

18  preclusive effect under state law.  Under these circumstances, it would not revisit the Commission's

19  factual findings.  *See also General Motors Corp. v. EPA*, 168 F.3d 1377, 1382 (D.C. Cir. 1999)

20  (where permittee did not challenge CWA permit under state law, federal court precluded permittee

21  from challenging it during enforcement proceeding).

22    Applying the *Kleenwell* standard to this case is not difficult.  Millennium had a more than

23  "adequate opportunity" to challenge the FEIS or dispute its findings under state law.  It fully

24  participated in the proceedings before the Cowlitz County Hearing Examiner, the PCHB, and the

25  SHB.  All of these proceedings were conducted in accordance with state law, presided over by

26  independent judges, and provided a full opportunity for Millennium to present evidence and argue

27  WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
28  COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB    10

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1   its views.  However, it never challenged the FEIS, which means that appeals are now foreclosed.

2   *Stand.Earth v. Skagit County*, SHB 18-011 (Wash. Shorelines Hearings Board, Sept. 28, 2018)

3   (plaintiffs' failure to timely challenge FEIS foreclosed challenge in subsequent proceedings)

4   (Hasselman Decl. Ex. 7).  Millennium itself argued to the Hearing Examiner that because no party

5   appealed the FEIS, compliance with SEPA "may not be challenged at this hearing *or at any other*

6   *hearing*."  Hasselman Decl. Ex. 8, at 11 (emphasis added).

7        Millennium's failure to challenge the FEIS as provided for under state law precludes any

8   effort to dispute its findings in this case by relying on contrary evidence.  Millennium should be

9   precluded from relitigating the contents of the FEIS in this proceeding or avoiding summary

10  judgment with evidence that contradicts the FEIS.  Instead, this Court should give preclusive effect

11  to the state's administrative decisions, and resolve the commerce clause claims based on the final

12  and binding facts established in the FEIS.

13        B.    Non-Discriminatory State and Local Actions are Subject to the Highly Deferential
              *Pike* Balancing Test.

14

15        In *Pike*, the U.S. Supreme Court struck down an Arizona statute requiring that cantaloupes

16  grown in the state must be packed in a specific manner.  Applying this statute, the state prohibited

17  an Arizona cantaloupe grower from transporting uncrated fruit to its nearby packing plant located in

18  California, where it had long packed its Arizona cantaloupes.  The Court found that the purpose of

19  the law was not to protect safety or consumers, areas "where the propriety of local regulation has

20  long been recognized."  Instead, the purpose was to enhance the reputation of Arizona melon

21  growers.  *Id*. at 143.  This "tenuous" interest was insufficient to justify the burden on the plaintiff of

22  having to build a new, unnecessary packing plant within the state just to comply with the statute.  *Id*.

23  at 145-46 (state's interest was "minimal at best").

24        In practice, the use of *Pike* balancing to strike down state and local actions is exceedingly

25  rare.  "For a facially neutral statute to violate the commerce clause, the burdens of the statute must

26  so outweigh the putative benefits as to make the statute unreasonable or irrational."  *Alaska Airlines,*

27

28

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                    11

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1  *Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991).  As the Ninth Circuit explained in

2  *Alaska Airlines*, courts have struck statutes under *Pike* in only two situations.

3  First, local statutes or regulations run afoul of *Pike* where they impose significant harm on

4  commerce, but provide literally no benefits at all.  *Id*.  In *Raymond Motor Trans. v. Rice*, 434 U.S.

5  439 (1978), for example, the Supreme Court struck down a Wisconsin regulation prohibiting 65-

6  foot long "double" trucks on its highway, when the state completely declined to submit any

7  evidence whatsoever in support of it.  *Id*. at 444 ("The State, for its part, virtually defaulted in its

8  defense of the regulations as a safety measure.").  With zero safety benefits, and no dispute that it

9  imposed significant costs, the truck ban could not pass the low threshold of *Pike*.  The outcome

10  would have been different had the state been able to "legitimately assert" some safety justification

11  for the rule.  "[I]f safety justifications are not illusory, the Court will not second-guess legislative

12  judgment about their importance in comparison with related burdens on interstate commerce."  *Id*.

13  at 449 (Blackmun, J., concurring).  This judicial deference to local judgments is at its greatest in

14  areas of safety, health, and environmental protection.  *Minnesota v. Clover Leaf Creamery Co*., 449

15  U.S. 456, 473 (1981) (even though burden of the plastic container ban was felt disproportionately

16  by out-of-state firms, it was "not 'clearly excessive' in light of the substantial state interest in

17  promoting conservation of energy and other natural resources and easing solid waste disposal

18  problems.").

19  The second situation in which *Pike* has been invoked involves hidden discrimination against

20  out-of-state interests—in essence, collapsing the two prongs of the commerce clause analysis.  *Hunt*

21  *v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353 (1977).  In *Hunt*, a facially

22  neutral law relating to the labelling of apples was found in its operation to discriminate against

23  apples from outside the state, to the benefit of in-state growers.  "When discrimination against

24  commerce of the type we have found is demonstrated, the burden falls on the State to justify it both

25  in terms of the local benefits from the statue and the unavailability of nondiscriminatory alternatives

26  adequate to preserve the local interests at stake."  *Id*.  The Ninth Circuit has recognized that most

27  WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN

28  COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                              12

*Pike* cases actually involve discrimination, rather than a comparison of burdens and benefits. *Nat'l Ass'n of Optometrists*, 682 F.3d at 1150.

There have been many *Pike* challenges to local actions that prohibit transloading terminals, pipelines, and ports, especially for fossil fuels. Every single one of them has failed. The *Norfolk Southern* court rejected a *Pike* challenge to a coal loading ban because it burdened all commerce equally. 822 F.2d at 402. The court rejected the argument that the ban unlawfully "precludes coal exporters from lowering their average transportation costs," because this was a "nondiscriminatory burden that must be shouldered by any coal transporter, regardless of state affiliation." *Id.* at 406-07. An ordinance prohibiting loading and unloading of crushed rock was found not to have even an "incidental burden" on commerce in *Wood Marine Serv. v. City of Harahan*, 858 F.2d 1061, 1064 (5th Cir. 1988). Even though "alternative routes will have to be found" for such shipments, and the plaintiff would not be able to participate in the market, that was not a "burden" on interstate commerce itself. *Id.* The Oregon Court of Appeals rejected a challenge to a local ordinance banning the construction or expansion of all "fossil fuel terminals." *Columbia Pacific Bldg.*, 289 Or. App. at 753. Finding that the ordinance provided "legitimate putative local benefits," like reducing the risks of accidents and protecting health, the court concluded that plaintiffs had failed to show that the burdens on commerce outweighed these benefits. *Id.* An administrative law judge in Oregon rejected (on summary judgment) a commerce clause challenge to the denial of a different Lighthouse-backed coal terminal on the Columbia River, due to impacts to tribal fishing. Hasselman Decl. Ex. 9, at 18-20.

C.     The Denial Does Not Impose a Significant Burden on Interstate Commerce.

Lighthouse cannot show that the § 401 denial imposes a "significant burden" on interstate commerce, for several reasons. First, as previously emphasized, the *Pike* analysis "protects the interstate market, not particular firms." *Exxon Corp.*, 437 U.S. at 127-28. But burdens on a particular firm is all that plaintiffs can show. WEC does not dispute that Lighthouse's inability to get a § 401 certificate for the terminal has interfered with its business plan for the site. Sweeney

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                              13

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1   Dep., at 57.  But that is not a commerce clause violation.  *PhRMA v. Concannon*, 249 F.3d 66, 84

2   (1st Cir. 2001) ("the fact that a law may have devastating economic consequences on a particular

3   interstate firm is not sufficient to rise to a Commerce Clause burden.").[2]

4          As to impacts on the coal export *market*, Lighthouse cannot show any because there will not

5   be one.  As noted above, the FEIS rigorously studied the market impacts of operating the terminal

6   and concluded that they would either be negligible or nonexistent.  FEIS at 5.8-17.  The Market

7   Study concluded "that rather than the new coal resource resulting in an increase in coal consumption

8   equal to the amount of coal exported, the increase *is close to zero* in all but the Upper Bound

9   Scenario."  Market Study at 1-5 (emphasis added).[3]  That is because U.S. exports "would mostly

10  replace internationally produced coal, instead of the full exported amount adding to overall global

11  coal demand."  *Id.* at 6-11.  For example, tables in the Market Study compare forecasted prices of

12  Indonesian and Australian coal under a "no action" scenario with prices in various scenarios under

13  which the terminal would operate.  *Id.*, at 4-6 to 4-9.  The tables reveal that coal prices in the Asian

14  market would be virtually identical with or without the project.  *Id.*

15         Indeed, the absence of an impact on the coal market is confirmed by plaintiffs themselves.

16  BNSF's expert conducted an analysis showing that the terminal would increase total coal exports

17  from Western coal mines by 27 million tons a year at full build out, less than *one quarter of one*

18  *percent* of the international coal import-export market, and a vanishingly insignificant portion of

19  total Asian coal consumption.  Schwartz Expert Report, at 13-14, 32-34.[4]  Millennium's own EIS

20

---

21  [2] Even so, plaintiffs' own evidence shows that the burdens are relatively modest.  Lighthouse is
22  already making a profit exporting coal from other terminals, as well as selling coal domestically.
    Sweeney Dep., at 179-80.  BNSF's expert report conceded that the terminal would constitute
23  only 4% of the company's total gross revenues at full operations decades from now—if BNSF
    carried all of the coal, which is unlikely.  Huneke Expert Report (Hasselman Decl., Ex. 10), at 15.
24  [3] Lighthouse's expert denigrated the "Upper Bound Scenario" as "not credible" and "extremely
    unlikely."  Berkman Rebuttal Report (Hasselman Decl. Ex. 14), at 8, 32.
25  [4] Lighthouse customer Cloud Peak downplayed the significance of the terminal on the market, as
    the coal exported through the terminal would constitute a "drop in the bucket" of a global coal
26  market.  Hasselman Decl. Ex. 13.  Lighthouse agreed that the terminal's coal "would barely
    move the needle" in a global market that could reach nine billion tons.  Sweeney Dep., at 197.

27  WEC'S MOTION FOR SUMMARY JUDGMENT
    ON PLAINTIFFS' DORMANT AND FOREIGN
28  COMMERCE CLAUSE CLAIMS
    Case No. 3:18-cv-05005-RJB                    14

comments forcefully argued that the coal exported from the project would have no impact on the total amount of coal consumed overseas, but "would simply substitute for subbituminous coal from Indonesia or other suppliers in the Asian market."  Hasselman Decl. Ex. 11, at 26.  The same point was made by the terminals' potential customers.  *See Id*. Ex. 12 at 3 ("Asian countries that could conceivably be served by coal exports from [Millennium] could *easily meet their coal requirements* from a number of sources other than the U.S.") (emphasis added).  Lighthouse's 30(b)(6) witness confirmed these comments explicitly.  Sweeney Dep., at 196-97, 201 (agreeing that "operation of the terminal will not cause more coal to be burned than would be the case without the operation of the terminal").  So did Lighthouse's and BNSF's market experts.  Berkman Dep. at 110-11 ("there's a shift in production and export in favor of the U.S. mines … the overall demand for coal may not change at all, but the sources of where the coal comes from would"); Schwartz Rep. at 2.  It may be true that whether or not the terminal is built will determine "winners and losers" in the coal market.  Berkman Dep. at 118.  But it will not have any notable impact on the market itself.  That is simply not the kind of local action that triggers commerce clause concerns.  *Yakima Valley Hosp. v. Washington Dep't of Health*, 731 F.3d 843 (9th Cir. 2013) (commerce clause is not concerned with actions that "shift … business from one competitor to another.").

Second, while the impacts of concern arise from the alleged shortage of terminal capacity anywhere on the west coast, this case challenges a solitary decision for a particular project in a particular place that Lighthouse prefers over other options.  However, the U.S. Constitution doesn't guarantee anyone a permit to build in the most profitable location.  Capacity exists to export coal from other locations—it simply isn't as profitable for Lighthouse to do so, due to higher transportation costs to these more distant sites.  The FEIS observed that existing terminals have physical capacity to satisfy Lighthouse's export needs.  Market Study, at 2-12; *Id*. at 5-8 (documenting planned expansions and new terminals).  In fact, Lighthouse already uses existing terminals in Canada to export coal, satisfy its contract obligations, and make a profit.  Sweeney Dep., at 175-180.  Other Western U.S. coal mines export from terminals as far away as Mexico,

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                                    15

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1   despite "much longer" rail and vessel distances to the Asian market.  Schwartz Rebuttal Report

2   (Hasselman Decl., Ex. 13) at 20.  There is also coal terminal capacity on the East and Gulf coasts.

3   Market Study, at 2-11, 2-17.  These locations, which are farther away from Lighthouse's mines than

4   the Millennium site, are not as well positioned to compete in the Asian market.  *Id.*[5]  But plaintiffs

5   conceded that coal shipped from these terminals could be competitive under different market

6   conditions.  Berkman Dep. at 123.

7        In other words, depending on market conditions, Lighthouse may or may not make a profit

8   from the terminal in Longview.  Sweeney Dep. at 180 (conceding that Lighthouse lost money on

9   shipments when prices fell below certain level).  Alternatively, market conditions may arise where it

10  could profitably sell its coal from alternative sites.  This entire case is built around Lighthouse's

11  desire to build a terminal at the location site where, for now at least, it would be best positioned to

12  compete coal in the Asian market.  Simply put, Lighthouse has no constitutional right to a particular

13  terminal location or the most profitable export scenario.  *Norfolk Southern*, 822 F.2d at 407

14  (claimed burden that local action "precludes coal exporters from lowering their average

15  transportation costs" is not a "legally relevant burden").  Ecology's decision to deny a permit for

16  Lighthouse's preferred site is simply not a *Pike* concern.

17       In sum, Lighthouse wants a tiny piece of the massive Asian coal export market.  It believes

18  that it could export coal most profitably from its preferred location in Longview.  But even it agrees

19  that the operation of the terminal will have no effect on the coal export market itself.  The

20  unchallenged FEIS found the same.  Instead, operating the terminal would provide some coal

21  suppliers with access to the Asian market at the expense of other companies.  The commerce clause

22  is not concerned with picking "winners and losers" in a market—it exists to protect the market

23

24

---

25  [5] Lighthouse complains that the alternative ports with capacity are "uneconomic" because of
    higher transportation costs, but their own evidence suggests that the difference is marginal.

26  Schwartz Rebuttal Rep., at 11 (massive Black Thunder mine is 1,347 miles from Lighthouse's
    site and 1,457 miles from Houston coal terminal on Gulf coast).

27  WEC'S MOTION FOR SUMMARY JUDGMENT
    ON PLAINTIFFS' DORMANT AND FOREIGN

28  COMMERCE CLAUSE CLAIMS                           16
    Case No. 3:18-cv-05005-RJB

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1   itself.  The modest impacts resulting from the § 401 denial are simply not the kinds of market

2   "burdens" that warrant commerce clause scrutiny.

3          D.      The Benefits of Denying the Terminal Are Well-Documented.

4          Because there is no significant burden on interstate commerce, there is little need to reach

5   the benefits side of the *Pike* balancing at all.  *Nat'l Assoc. of Optometrists*, 682 F.3d at 1155

6   ("where, as here, there is no discrimination and there is no significant burden on interstate

7   commerce, we need not examine the actual or putative benefits of the challenged statutes").  Should

8   the Court choose to do so, however, there is abundant support for the benefits that Ecology achieved

9   by denying the § 401 certification.  These benefits are documented in detail in the FEIS, which

10  analyzed harm to public safety, such as increased risk of rail, traffic, and vessel accidents caused by

11  moving millions of tons of coal.  As the Ninth Circuit has emphasized, "regulations that touch on

12  safety are those that the Court has been most reluctant to invalidate."  *Kleenwell*, 48 F.3d at 398-400

13  (state's interest "in assuring the health and safety of its citizens clearly outweighs" burdens on

14  commerce).  The FEIS also found that human health and the environment were threatened by the

15  project.  These findings also warrant deference from this Court.  *Clover Leaf Creamery,* 449 U.S. at

16  473 (upholding burdens on interstate commerce in light of "substantial state interest in prompting

17  conservation"); *Wood Marine*, 858 F.2d at 1066 (applying "great deference" to local land use

18  ordinances in *Pike* balancing).

19         Even plaintiffs admit that there are significant health, traffic, and conservation benefits of

20  not having this project built.  Specifically, the state and Lighthouse each prepared extensive expert

21  reports seeking to quantify the benefits of *not* building the terminal.  To be sure, these experts reach

22  very different conclusions.  Even so, Lighthouse's expert nonetheless concedes significant benefits,

23  testifying that the air quality benefits of permit denial "should not exceed $162 million;" the impact

24  of vehicle delays is "between $79 and $121 million;" and the impact of avoided rail accidents is

25  "between $190 and $283 million."  Berkman Rebuttal Report (Hasselman Decl. Ex. 14), at 8-9.  In

26  WEC's view, Lighthouse's expert seriously underestimates many of these and other benefits.  But

27  WEC'S MOTION FOR SUMMARY JUDGMENT
    ON PLAINTIFFS' DORMANT AND FOREIGN
28  COMMERCE CLAUSE CLAIMS
    Case No. 3:18-cv-05005-RJB                     17

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1   even accepting Lighthouse's facts for purposes of this motion, Lighthouse has conceded *hundreds*

2   *of millions of dollars* in benefits to environmental values and human health from denying the

3   project's permits.  These concessions are fatal to Lighthouse's *Pike* challenge.  *Alaska Airlines,* 951

4   F.2d at 984 (regulation that has "some legitimate justification would easily pass" the *Pike* test);

5   *Portland Pipe Line,* 332 F. Supp. 3d at 312 ("The City has real interests in reducing the visual,

6   auditory, and olfactory externalities of heavy industrial activities within its borders and encouraging

7   recreational and lower-impact development on the waterfront.").

8        Plaintiffs fundamentally misunderstand the *Pike* analysis.  They appear to believe it

9   authorizes this Court to engage in a generalized cost-benefit analysis of any project that potentially

10  influences commerce.  In their view, if the benefits of the terminal outweigh its costs, Lighthouse is

11  constitutionally entitled to a permit.  Berkman Rebuttal Report, at ¶ 10; Berkman Dep. at 103

12  (benefits of denial are "likely to be less than the costs to commerce").  While WEC believes that the

13  costs of this project far outweigh any putative benefits—as confirmed in the FEIS and the several

14  parallel decisions rejecting the project—that is not the standard.  *Pike* scrutiny is invoked only in

15  extreme situations where a government acts "irrationally" to impose a significant impact on a

16  market with no corresponding interest to support it.  *Alaska Airlines*, 951 F.2d at 983.  That is not

17  remotely the situation here.  The Third Circuit, writing in a closely analogous case, held:

18          Norfolk Sothern's arguments reduce to an assertion that increasing coal exports is in
19          the national interest and that Delaware, in seeking to protect its own environment,
            has struck an unwise balance between these competing interests.  In our view, the
20          dormant Commerce Clause does not authorize a federal court to engage in the kind
            of broad-based "national interest balancing" requested by Norfolk Southern.

21  *Norfolk Southern*, 822 F.3d at 407; *Wood Marine*, 858 F.2d at 1065 ("The fact that Wood Marine

22  has been excluded from the business of shipping construction materials does not, without more,

23  implicate the Commerce Clause.)  This Court should likewise reject Lighthouse's misguided effort

24  to invoke the commerce clause.  Summary judgment should be granted to WEC.

25

26

27  WEC'S MOTION FOR SUMMARY JUDGMENT
    ON PLAINTIFFS' DORMANT AND FOREIGN
28  COMMERCE CLAUSE CLAIMS
    Case No. 3:18-cv-05005-RJB                    18

1    III.    THE § 401 DENIAL DOES NOT VIOLATE THE FOREIGN COMMERCE CLAUSE.

2            A.    Overview of Foreign Commerce Clause

3            The "foreign" dormant commerce clause doctrine is "relatively undeveloped" compared to

4    the dormant commerce clause.  *Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46 (1st Cir.

5    2005).  In *Japan Line v. County of Los Angeles*, 441 U.S. 434 (1979), the Supreme Court articulated

6    the doctrine when it found unlawful a California tax on foreign-registered shipping vessels passing

7    through the state's territory.  It found the state tax could "impair federal uniformity in an area *where*

8    *federal uniformity is essential*" and could prevent the Federal government from "speaking with one

9    voice when regulating commercial relations with foreign governments." *Id*. at 448, 451 (emphasis

10   added).  Invalidation under this "one voice" standard is extraordinarily rare.  Courts have only

11   invalidated state laws under the foreign commerce clause where they contained facial, "patent"

12   discrimination against foreign commerce, for instance, a state trading ban with a specific country.

13   *Natsios v. Nat'l Foreign Trade Council*, 181 F.3d 38, 46 (1st Cir. 1999).  Efforts to protect local

14   environmental values easily pass muster under this standard, even if they have an impact on foreign

15   commerce.  *Pacific NW Venison Prod. v. Smitch*, 20 F.3d 1008 (9th Cir. 1994) (upholding ban on

16   imported wildlife because such trade is "not a matter in which national uniformity is important").

17           As with the dormant commerce clause, courts remain on the lookout for economic

18   "discrimination" that benefits domestic interests at the expense of foreign commerce.  For instance,

19   the Third Circuit rejected a foreign commerce clause challenge to a local coal loading ban because it

20   "does not manipulate the terms of international trade for the state's economic benefit by imposing

21   embargoes, quotas, or tariffs." *Norfolk Southern*, 822 F.2d at 404.  The court recognized that

22   "[v]irtually all regulation in the state of origin of goods ultimately shipped in foreign commerce

23   affects the costs of those goods and, accordingly, the quantity sold abroad." *Id*. at 405.  The relevant

24   constitutional question was not whether there was some impact on foreign commerce, but rather

25   "the degree to which the state law impinges on the need for federal uniformity in the area of foreign

26   trade policy." *Id*.  The court in *Portland Pipe Line* rejected a foreign commerce clause challenge to

27

1    a crude oil loading ban, finding that it was not intended to "discriminate" against foreign commerce

2    for the benefit of national interests.  332 F. Supp. 3d at 300-02.  Absent any "relative difference in

3    treatment," there was no constitutional concern.  *Id.*

4          **B.**   <u>The § 401 Permit Denial Does Not Violate the Foreign Commerce Clause.</u>

5          Ecology's § 401 denial does not come close to running afoul of these broad limits.  It does

6    not "discriminate" against foreign commerce in any way.  To the contrary, Ecology's decision is

7    agnostic as to both the source and the destination of the terminal's cargo, and "does not create any

8    distinction or difference between competitors from different countries or states."  *Portland Pipe*

9    *Line*, 332 F. Supp. 3d at 302.  As discussed above, the decision does not have a noticeable impact

10   on the international coal market, nor does it target any particular foreign country, like the anti-

11   Burma statute struck down in *Natsios*.  Instead, it is a garden-variety administrative decision to

12   reject a project that threatens the environment and human health, one that arguably has—at worst—

13   a minor incidental impact on foreign trade.  Such decisions are commonplace and do not violate

14   constitutional limits.  *Pacific NW Venison Prod.*, 20 F.3d at 1014 (measures to protect environment

15   "carry a strong presumption of validity").

16         Nor does Ecology's denial of a single permit impair the federal government's ability to

17   "speak with one voice" on matters pertaining to the international coal trade.  *Japan Line*, 441 U.S. at

18   449.  As explained in WEC's motion addressing BNSF's "foreign affairs doctrine" claim, there is

19   no overarching federal policy favoring the export of coal.  *See* ECF 206; *Portland Pipe Line*, 332 F.

20   Supp. 3d at 314 (noting similarity between foreign affairs and foreign commerce clause doctrines).

21   To the contrary, many current federal actions and policies actively *undermine* the goal of increased

22   coal exports.  In 2016, a federal agency denied a CWA permit for a similar coal terminal in

23   Washington due to its adverse impacts on Tribal treaty-protected fishing—hardly reflective of a

24   strong pro-coal export federal policy.  *Id.* at 70; Hasselman Decl. Ex. 15.  The coal industry

25   compiled an entire report cataloguing the ways in which federal policies collide with the industry's

26   goals of increasing coal export to Asia.  Hasselman Decl. Ex. 16.  While the current Administration

27   
28   WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB       20

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

has voiced generalized support for increasing energy exports, it has also adopted specific policies, like trade tariffs on Asian trading partners, that make exporting coal harder.  Ex. 16 at 4.[6] Moreover, Lighthouse itself has expended significant efforts to *change* federal policies so that its terminal could get built, an implicit concession that federal policies do not favor the project. Sweeney Dep. at 150-68.  In any event, Ecology's denial is consistent with other federal policies, for example, Congress's grant of broad discretionary authority to States under the CWA to protect local water quality.  33 U.S.C. § 1341; § 1251 (recognizing and preserving the "primary responsibilities and rights of States" under the CWA).

Lighthouse apparently believes that a state or local community cannot take action to protect local health, safety, or the environment if it has any impact on international trade, no matter how small.  That is emphatically not the law, and would render virtually all local police power null if it was.

> Any local regulation or prohibition on a large and important industry will inevitably touch on federal commerce in a broad sense, given the realities of a modern globalized economy.  But that does not mean it impermissibly interferes with the government's ability to "speak with one voice" when regulating foreign commerce or impairs uniformity in an area where federal uniformity is essential.

*Portland Pipe Line*, 332 F. Supp. 3d at 316.  This Court should reject Lighthouse's strained theory that Ecology's permit denial—neutral on its face *and* in effect, with only an incidental impact on foreign commerce—is a constitutional-level interference with international trade.

## CONCLUSION

For the foregoing reasons, this Court should grant WEC's motion for summary judgment on Plaintiffs' dormant and foreign commerce clause claims, and dismiss this case.

---

[6] As with the crude oil loading ban at issue in *Portland Pipe Line*, the denial is not just "unlikely to provoke international objections and retaliation," it simply has not done so.  332 F. Supp. 3d at 303. At best, Lighthouse may be able to show some government-owned utilities in Asia would like to "diversify" their sources of coal by accessing U.S. coal.  Schwartz Report, at 18.  But there is no *physical* barrier to such utilities accessing U.S. coal today—it is simply more expensive to access Powder River Basin coal due to higher transportation costs.

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                            21

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    Respectfully submitted this 13th day of February, 2019.

2

3                                    _s/ Jan E. Hasselman_
                                     Jan E. Hasselman, WSBA #29107
4                                    Kristen L. Boyles, WSBA #23806
                                     Marisa C. Ordonia, WSBA #48081
5                                    EARTHJUSTICE
                                     705 Second Avenue, Suite 203
6                                    Seattle, WA  98104-1711
                                     Ph.: (206) 343-7340
7                                    Fax: (206) 343-1526
                                     kboyles@earthjustice.org
8                                    jhasselman@earthjustice.org
                                     mordonia@earthjustice.org
9

10                                   *Attorneys for Defendant-Intervenors Washington*
                                     *Environmental Council, Columbia Riverkeeper,*
11                                   *Friends of the Columbia Gorge, Climate Solutions,*
                                     *and Sierra Club*
12

13                                   Jessica L. Yarnall Loarie, CSBA #252282
                                     Sierra Club, Environmental Law Program
14                                   2101 Webster St., Suite 1300
                                     Oakland, CA 94612
15                                   Ph.: (415) 977-5636
                                     Fax: (510) 208-3140
16                                   jessica.yarnall@sierraclub.org

17                                   *Attorney for Defendant-Intervenor*
                                     *Sierra Club*
18

19

20

21

22

23

24

25

26

27   WEC'S MOTION FOR SUMMARY JUDGMENT
     ON PLAINTIFFS' DORMANT AND FOREIGN                    *Earthjustice*
28   COMMERCE CLAUSE CLAIMS                                *705 Second Ave., Suite 203*
     Case No. 3:18-cv-05005-RJB              22            *Seattle, WA  98104*
                                                           *(206) 343-7340*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

Dated this 13th day of February, 2019.

*s/ Jan E. Hasselman*
Jan E. Hasselman, WSBA #29107

WEC'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' DORMANT AND FOREIGN
COMMERCE CLAUSE CLAIMS
Case No. 3:18-cv-05005-RJB                23

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*